**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IGNACIO LANUZA,
*Plaintiff-Appellant*,

v.

JONATHAN M. LOVE, Assistant Chief
Counsel, Immigration and Customs
Enforcement,
*Defendant-Appellee.*

No. 15-35408

D.C. No.
2:14-cv-01641-
MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, Senior District Judge, Presiding

Argued and Submitted October 3, 2017
Seattle, Washington

Filed August 14, 2018

Before: Kermit Victor Lipez,* Kim McLane Wardlaw,
and John B. Owens, Circuit Judges.

Opinion by Judge Wardlaw

---

* The Honorable Kermit V. Lipez, United States Circuit Judge for
the First Circuit, sitting by designation.

## SUMMARY[**]

### *Bivens*

The panel reversed the district court's order declining to extend a *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), remedy to an immigrant pursuing lawful permanent resident status where a government immigration attorney intentionally submitted a forged document in an immigration proceeding to completely bar that immigrant from pursuing relief to which he was entitled.

The panel concluded that while the Supreme Court "has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)), a *Bivens* remedy was available in this narrow circumstance because none of the special factors outlined in *Abbasi* and other Supreme Court precedent applied.

The panel affirmed the district court's order denying qualified immunity to ICE Assistant Chief Counsel Jonathan Love because qualified immunity was not meant to protect those who are "plainly incompetent or those who knowingly violate the law." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). The panel concluded that qualified immunity could not shield an officer from suit when he intentionally

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

submitted a forged document in an immigration proceeding in clear violation of 8 U.S.C. § 1357(b).

## COUNSEL

Matt Adams (argued) and Glenda M. Aldana Madrid, Northwest Immigrant Rights Project, Seattle, Washington; Christopher Schenck and Stephanie M. Martinez, Kilpatrick Townsend & Stockton LLP, Seattle, Washington; for Plaintiff-Appellant.

Amanda E. Lee (argued), Law Office of Amanda Lee PLLC, Seattle, Washington, for Defendant-Appellee.

H. Thomas Byron III (argued) and Barbara L. Herwig, Appellate Staff; Joseph H. Harrington, Acting United States Attorney; Chad A. Readler, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Amicus Curiae United States.

Mary Kenney, American Immigration Council, Washington, D.C.; Trina Realmuto, National Immigration Project of the National Lawyers Guild, Boston, Massachusetts; for Amici Curiae American Immigration Council and National Immigration Project of the National Lawyers Guild.

## OPINION

WARDLAW, Circuit Judge:

We are tasked with answering in part a question asked by many legal commentators in the wake of the Supreme Court's decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017): where does *Bivens* stand? *Bivens* is the first Supreme Court decision to recognize an implied right of action for damages against federal officers alleged to have violated a plaintiff's constitutional rights. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 392–98 (1971). Here, a U.S. Immigration and Customs Enforcement (ICE) Assistant Chief Counsel representing the government intentionally forged and submitted an ostensible government document in an immigration proceeding, which had the effect of barring Ignacio Lanuza (Lanuza) from obtaining lawful permanent resident status, a form of relief to which he was otherwise lawfully entitled. We recognize that the Supreme Court "has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *Abbasi*, 137 S. Ct. at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)), but, if the principles animating *Bivens* stand at all, they must provide a remedy on these narrow and egregious facts. We therefore reverse the district court's holding that Lanuza was not entitled to a *Bivens* remedy.

## I.

Lanuza is a 38-year-old lawful permanent resident married to a U.S. citizen with two U.S. citizen children. He was born in Mexico and first came to the United States without inspection when he was seventeen years old. He lives and works in Seattle, Washington. In July 2008, the Department of Homeland Security (DHS) commenced removal proceedings against him before the Tacoma

immigration court, which were ultimately transferred to the Seattle immigration court.

On May 6, 2009, Lanuza appeared before an immigration judge for a master calendar hearing. During that hearing, Lanuza notified the court of his intention to apply for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents (cancellation of removal or cancellation) under 8 U.S.C. § 1229b(b)(1). At the time, he was prima facie eligible to apply for cancellation of removal, which is a type of immigration relief that enables nonpermanent residents to adjust their status to that of permanent residents. To qualify for cancellation, a person must demonstrate (1) continuous physical presence in the United States for ten years immediately prior to being served with the Notice to Appear; (2) good moral character; (3) that he is not subject to any other bar to eligibility on account of having certain criminal convictions; and (4) the existence of a U.S. citizen or lawful permanent resident spouse, parent, or child who would suffer exceptional and extremely unusual hardship if the person were removed. *See* 8 U.S.C. § 1229b(b)(1). As later events would confirm, Lanuza satisfied all these requirements: (1) he had been residing continuously in the United States since 1996 and thus had more than ten years of continuous residence; (2) he possessed good moral character; (3) he was not subject to any other bar to eligibility; and (4) his U.S. citizen wife and children would suffer exceptional and extremely unusual hardship without him.

During the master calendar hearing, ICE Assistant Chief Counsel Jonathan Love ("Love") stated that Lanuza's immigration file contained an I-826 form, signed by Lanuza, accepting voluntary departure to Mexico in 2000. The I-826 form was critical in determining whether Lanuza would be

able to remain in the United States with his family, because a signed I-826 form would render him ineligible for cancellation of removal. By signing an I-826 form, a person accepts an administrative voluntary departure instead of exercising his right to appear before an immigration judge in removal proceedings and thereby breaks whatever continuous physical presence he may have accrued. *See Ibarra-Flores v. Gonzales*, 439 F.3d 614, 618–20 (9th Cir. 2006); *see also Landin-Zavala v. Gonzales*, 488 F.3d 1150, 1152–53 (9th Cir. 2007) ("When [an individual] leaves pursuant to an administrative voluntary departure[ ]'[he] leaves with the knowledge that he does so in lieu of being placed in proceedings. . . .'" (quoting *Tapia v. Gonzales*, 430 F.3d 997, 1002 (9th Cir. 2005))). As a result, even though Lanuza met all the other elements of § 1229b(b)(1), if Lanuza had signed an I-826 form in 2000, he would have accrued continuous residence in the United States for only seven years, rather than the requisite ten years. *See* 8 U.S.C. § 1229b(b)(1).

On May 11, 2009 at Lanuza's actual immigration hearing, Love submitted an I-826 form agreeing to voluntary departure, purportedly signed by Lanuza on January 13, 2000, making Lanuza ineligible for cancellation of removal. *See id*. Based solely on that I-826 form, the immigration judge issued an order of removal on January 5, 2010; the Board of Immigration Appeals ("BIA") affirmed on November 15, 2011.

On December 9, 2011, Lanuza hired new counsel, Hilary Han ("Han"), who discovered, for the first time, evidence that the I-826 form Love submitted was forged. Han sent the I-826 form to a forensic examiner, who, on February 1, 2012, confirmed that the form was forged. While several aspects of the form demonstrated it was forged, most glaringly, it

referred to the "U.S. Department of Homeland Security" at the top of the page, an agency that did not exist at the time Lanuza purportedly signed the form on January 13, 2000. Congress created DHS in response to the September 11, 2001 terrorist attacks, and the agency did not begin formal operations until 2003. Therefore, it would have been impossible for Lanuza to sign the DHS I-826 form in January 2000, because that form did not then exist.

Based on the forensic report, the BIA reopened and remanded the case, and, on remand, the immigration judge ultimately found that Lanuza was prima facie eligible to apply for cancellation of removal. The agency adjusted his status to lawful permanent resident on January 9, 2014.

The government did not take any action against Love until after this lawsuit was filed on October 24, 2014. Love was ultimately prosecuted and pleaded guilty to deprivation of rights under color of law pursuant to 18 U.S.C. § 242, which ICE characterized as a "deprivation of constitutional rights" in a press release.[1] Love was sentenced to a thirty-day term of imprisonment, one year of supervised release, and 100 hours of community service. *See United States v. Love*, No. 2:16-cr-00005-BAT-1, ECF No. 16 (W.D. Wash. April 20, 2016). He was also barred from practicing law for ten years and was required to pay restitution to Lanuza in the amount of $12,000, a figure the government proposed based on its approximation of the legal fees Lanuza paid related to

---

[1] Press Release, U.S. Immigration & Customs Enforcement, Ex-Ice Attorney Sentenced to Prison for Falsifying Document in Immigration Case (Apr. 20, 2016), https://www.ice.gov/news/releases/ex-ice-attorney-sentenced-prison-falsifying-document-immigration-case.

his removal proceedings as a result of Love's submission of the forged I-826 form. *Id*. at 6–7.

On October 23, 2014, Lanuza filed a complaint against Love and the United States alleging, among other things, that he was entitled to damages under *Bivens* for a violation of his Fifth Amendment right to due process. Love filed a motion to dismiss, which the district court hesitantly granted. While the district court believed Lanuza was entitled to relief, the court felt its hands were tied by our decision in *Mirmehdi v. United States*, 689 F.3d 975 (9th Cir. 2012), which declined to extend *Bivens* to a claim for wrongful detention in the course of immigration removal proceedings. The district court further held that, if a *Bivens* remedy were available, Love was not entitled to qualified immunity. Lanuza timely appealed.

## II.

Whether a *Bivens* remedy is available here turns on the presence of the conditions articulated in *Abbasi* for extending the *Bivens* remedy. *See Abbasi*, 137 S. Ct. at 1856–58. In *Abbasi*, the Supreme Court addressed whether Respondents, noncitizens who were suspected of having ties to terrorism and detained in harsh conditions in the aftermath of September 11, could pursue *Bivens* remedies against various high-level federal officials responsible for the policy that authorized their detention and the wardens responsible for their treatment thereafter. *Id.* at 1853–54. The Court articulated a two-part test for determining whether *Bivens* remedies should be extended. *Id.* at 1859–60. First, courts must determine whether the plaintiff is seeking a *Bivens* remedy in a new context. *Id.* If the answer to this question is "no," then no further analysis is required. *Id.* If the answer is "yes," then the court must determine whether "special factors counsel[] hesitation." *Id.* at 1860.

A case presents a new context if it "is different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]." *Id.* at 1859. The Court explained that:

> [A] case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.

Applying this framework to that suit, the Court found that Respondents' challenge to the executive officials' detention policy presented a new context, reasoning that:

> [The challenge to] the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil . . . [bore] little resemblance to the three *Bivens* claims the [Supreme] Court . . . approved in the past: a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma.

*Id.* (referring to *Bivens*, 403 U.S. 388; *Davis v. Passman*, 442 U.S. 228 (1979); and *Carlson v. Green*, 446 U.S. 14 (1980), respectively).

Proceeding to the "special factors analysis," the Court found those factors counseled against implying a *Bivens* remedy. *Id.* First, a *Bivens* action is intended to discourage illegal acts by individual officers and is not "a proper vehicle for altering an entity's policy." *Id.* (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). Second, "the burden and demand of litigation [against high-level officials] might well prevent them—or, to be more precise, future officials like them—from devoting the time and effort required for the proper discharge of their duties." *Id*. (citing *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382 (2004)). Third, these claims raise serious separation-of-powers issues and "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch" and "challenge . . . major elements of the Government's whole response to the September 11 attacks, thus of necessity requiring an inquiry into sensitive issues of national security." *Id.* at 1861 (citations omitted). Fourth, congressional interest in the response to the terrorist attacks was "frequent and intense," including interest in "the conditions of confinement at issue[,]" and Congress chose not to create a damages remedy. *Id.* at 1862 (citation omitted). Finally, Respondents had alternate avenues of relief available to challenge their condition of confinement. Respondents could have pursued injunctive relief to attack the large-scale detention policy or perhaps a petition for a writ of habeas corpus to attack their own confinement. *Id.* at 1862–63. The Court reasoned, while "[t]here is . . . a balance to be struck, in situations like this one, between deterring constitutional violations and freeing high officials to make the lawful decisions necessary to protect the Nation in times of great peril . . . . [t]he proper

balance is one for the Congress, not the Judiciary, to undertake." *Id.* at 1863 (citation omitted).

The Court separately considered the prisoner abuse claim against Warden Hasty, the warden of the prison where Respondents were held.  Addressing whether this claim presented a new context, the Court compared Respondents' case to *Carlson v. Green*, 446 U.S. 14 (1980), a Supreme Court case where a prisoner's estate sued federal jailers for failing to treat the prisoner's asthma, ultimately leading to his death.  *Id.* at 16 n.1; *Abbasi*, 137 S. Ct. at 1864.  In *Carlson*, the Court found the failure to treat a prisoner's medical needs violated his Eighth Amendment right to be free from cruel and unusual punishment.  446 U.S. at 17–18. The *Abbasi* Court distinguished Respondents' case from *Carlson*, finding it meaningful that the *Abbasi* Respondents challenged violations of the Bureau of Prisons' policy, unlike in *Carlson* where the prison's policy was not at issue. *Abbasi*, 137 S. Ct. at 1864.  The Court further noted that, unlike judicial guidance as to the medical treatment at issue in *Carlson*, "the judicial guidance available to this warden, with respect to his supervisory duties, was less developed." *Id.*  Acknowledging that there were "significant parallels" between the Respondents' case and *Carlson*, and that the "allegations of injur[ies] here are just as compelling as those at issue in *Carlson*," the Court nevertheless found Respondents' claims presented a new *Bivens* context, reasoning that "a modest extension is still an extension." *Id.* And, the Court found that "this case does seek to extend *Carlson* to a new context."  *Id.*  The Court did not perform the special factors analysis, and instead remanded the claim against Warden Hasty to the Court of Appeals to perform a special factors analysis in the first instance.  *Id.* at 1865.

One week after *Abbasi* was decided, the Supreme Court again had the opportunity to revisit *Bivens*. In *Hernandez v. Mesa*, a U.S. Border Patrol agent standing on U.S. soil shot and killed a fifteen-year-old Mexican boy who was playing with a group of friends in the cement culvert that separates Texas and Mexico. 137 S. Ct. 2003, 2004–06 (2017) (per curiam). His parents brought a claim against the officer for damages under *Bivens*. *Id.* at 2005. The Court declined to decide whether a *Bivens* claim existed in the first instance because the Court of Appeals had not had the opportunity to consider how the reasoning in *Abbasi* might bear on Hernandez's case, and the parties had not briefed the issue. *Id.* at 2006–07. The Court remanded the case to the Court of Appeals to apply the *Abbasi* framework to Hernandez's Fourth and Fifth Amendment claims. *Id.*

## A.

Before addressing *Abbasi*'s two part test, we must first consider whether providing a *Bivens* remedy here is precluded by prior cases in which the Supreme Court or our court has declined to extend *Bivens*. We have found no such case. And, unlike the district court, we do not believe that our decision in *Mirmehdi* precludes a remedy here.

The conduct at issue—the falsification of evidence—has been regularly considered by the courts in actions against prosecutors who commit similar constitutional violations by falsifying evidence and suborning perjury. The Supreme Court has long recognized that "[t]he principle that a State may not knowingly use false evidence . . . to obtain a tainted conviction [is] implicit in any concept of ordered liberty," and a violation of due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Pyle v. Kansas*, 317 U.S. 213, 215–16 (1942); *Mooney v. Holohan*, 294 U.S. 103, 110, 112–13 (1935) (per curiam). For this reason, in 42 U.S.C. § 1983

cases,[2] the Supreme Court has declined to extend absolute prosecutorial immunity to prosecutors who falsify evidence because the collection of evidence is an "investigative function[] normally performed by a detective or police officer." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

We see no reason to distinguish the due process rights of a criminal defendant in a criminal proceeding from the due process rights of an immigrant in a deportation proceeding when a government attorney falsifies evidence. It is well-settled that "the Due Process clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1209 (2018) (plurality

---

[2] The Supreme Court has concluded that a prosecutor may be held liable for damages under *Bivens*, but has not extended a *Bivens* remedy to a claim of prosecutorial misconduct. *Hartman v. Moore*, 547 U.S. 250, 261–66 (2006) (holding that a *Bivens* remedy may be available for malicious prosecution, but the plaintiff had to allege and prove lack of probable cause).

The Seventh Circuit, however, has extended *Bivens* remedies in the *Brady* context. *Engel v. Buchan*, 710 F.3d 698, 708 (7th Cir. 2013). In *Engel v. Buchan*, the Seventh Circuit provided a *Bivens* remedy for *Brady* violations pursuant to the Due Process Clause of the Fourteenth Amendment. *Id.* The court explained that punishing a federal officer in that context presents "no great problem of judicial interference with the work of law enforcement, certainly no greater than the Fourth Amendment claim in *Bivens*." *Id.* While unlike the court in *Engel*, the Board of Immigration Appeals is not an Article III court, it conducts its hearings using similar procedures: parties submit evidence, question witnesses under oath, and the procedure is overseen by an individual called a "judge." If remedies are available to punish *Brady* violations in a criminal proceeding where liberty is at stake, they should also be available in the context of immigration proceedings to determine removability—a deprivation of liberty that can be as consequential.

opinion) ("[T]his Court has reiterated that deportation is 'a particularly severe penalty,' which may be of greater concern to a convicted alien than 'any potential jail sentence.'" (quoting *Jae Lee v. United States*, 137 S. Ct. 1958, 1968 (2017); *Padilla v. Kentucky*, 559 U.S. 356, 365, 368 (2010))); *Zahedi v. INS*, 222 F.3d 1157, 1164 n.6 (9th Cir. 2000) (stating that "immigration proceedings as a whole" are governed "by the Fifth Amendment's Due Process Clause").

Moreover, while *Abbasi* clearly limited *Bivens*'s scope, it did not preclude this case; nor is this case precluded by other Supreme Court precedent. The Supreme Court has recognized a *Bivens* remedy is available under the Fifth Amendment. In *Davis v. Passman*, the Court concluded that a U.S. Congressman's former staff member was entitled to a *Bivens* remedy where the Congressman terminated her because of her gender, violating her rights under the equal protection component of the Fifth Amendment. 442 U.S. at 248–49. While the Supreme Court has not extended *Bivens* to a case involving the substantive and procedural clauses of the Fifth Amendment, *Abbasi* did not preclude the possibility of such an extension. *See Abbasi*, 137 S. Ct. at 1860–64.

Nor has the Supreme Court barred extending *Bivens* remedies to an immigration case. Although *Abbasi* could have stood for the broad proposition that *Bivens* remedies are not available in the context of immigration proceedings because of the sensitive nature of immigration policy, the *Abbasi* Court did not paint in such broad strokes; rather, it cabined its holding to suits against executive officials issuing policy responses to sensitive issues of national security. *Id.* at 1863. *Abbasi* made no statements about the general nature

of immigration, low-level immigration officials, or the comprehensiveness of the INS's remedial scheme.**[3]**

Nor is this case precluded by our precedent. The government argues that this action is foreclosed by *Mirmehdi*, where we declined to extend *Bivens* to claims challenging unlawful immigration detention. In that case, which closely mirrors the facts addressed in *Abbasi*, petitioners Mohammad, Mostafa, Mohsen, and Mojtaba Mirmehdi (collectively the "Mirmehdis") were originally detained for national security reasons and charged as supporters of an officially listed terrorist organization, the Mujahedin-e Khalq. 689 F.3d at 978–79. We concluded that the Mirmehdis were not entitled to *Bivens* damages because

---

[3] In other contexts, the Supreme Court has declined to extend *Bivens* remedies based on the special class of federal defendants or the sensitivity of government activity involved. *See, e.g.*, *Malesko*, 534 U.S. at 63 (no *Bivens* action against private correctional corporation acting under color of federal law); *F.D.I.C. v. Meyer*, 510 U.S. 471, 473 (1994) (no *Bivens* action against a federal agency); *United States v. Stanley*, 483 U.S. 669, 683–84 (1987) (no *Bivens* action for injuries arising out of or in the course of activity incident to military service); *Chappell v. Wallace*, 462 U.S. 296, 299–304 (1983) (same). It has also declined to extend *Bivens* if Congress has articulated a complex remedial scheme, even if there is no damages remedy available. *See, e.g.*, *Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988) (no *Bivens* action for an alleged due-process violation in connection with the denial of disability benefits because Congress did not provide for damages in its comprehensive remedial scheme); *Bush v. Lucas*, 462 U.S. 367, 368 (1983) (no *Bivens* action where a federal employer commits a First Amendment violation because relief, even if incomplete, is available under a comprehensive statutory scheme). These cases do not preclude extending a *Bivens* remedy here because Love is not a member of a special class, there is no sensitive government information at issue, and the INA's complex remedial scheme does not address the conduct at issue here. *See infra* Part II.C.

they were able to challenge their detention through two different remedial systems: the immigration system and habeas relief. *Id.* at 982. We noted that "Congress's failure to include monetary relief [in the INA] can hardly be said to be inadvertent, given that despite multiple changes to the structure of the [INA,] Congress never created such a remedy." *Id.* (citing *Schwieker*, 487 U.S. at 423, 425). We also concluded that the Mirmehdis' case implicated national security concerns, because allowing the Mirmehdis to pursue this lawsuit would result in disclosing "foreign-intelligence products." *Id.* at 983 (citation omitted).

Without the benefit of *Abbasi*, the district court in this case agreed with the government's argument that our decision in *Mirmehdi* precluded a *Bivens* remedy because it stood for the broad proposition that there can be no *Bivens* remedy for any constitutional violation in the context of immigration proceedings, even while noting the obvious problems with such a reading.**[4]** However, *Abbasi* makes clear that *Mirmehdi* does not, and cannot, stand for such a categorically broad proposition. Instead, we must look to the specific facts of this case and the claims presented. *See Abbasi*, 137 S. Ct. at 1859–60. Although *Mirmehdi* and this case both arise out of immigration generally, the similarities between *Mirmehdi* and Lanuza's case end there. *Mirmehdi* relates to the detention of suspected terrorists, while

---

**[4]** The district court correctly noted that "this analysis conflates the availability of procedures to challenge an immigration decision with the availability of protections to deter constitutional violations in the first instance." The district court also correctly noted that under *Mirmehdi*, the simple fact that this is an immigration case does not mean that issues of national security, diplomacy or foreign policy are necessarily implicated.

Lanuza's case concerns an individual attorney's violation of his due process rights in a routine immigration proceeding.

Accordingly, precedent does not preclude providing a *Bivens* remedy here.

## B.

Lanuza's claim arises in the context of deportation proceedings where a federal immigration prosecutor submitted falsified evidence in order to deprive Lanuza of his right to apply for lawful permanent residence. We know of no other case that has discussed a *Bivens* remedy in this context.[5] The conclusion that Lanuza's case arises in a

---

[5] We have addressed *Abbasi*'s new *Bivens* framework in five circumstances, including two published opinions, which are also distinguishable from this case. *See Rodriguez v. Swartz*, No. 15-16410, 2018 WL 3733428 (9th Cir. Aug. 7, 2018) (extending a *Bivens* remedy to the mother of a child who was shot and killed on Mexican soil by an American agent standing on U.S. soil); *see Vega v. United States*, 881 F.3d 1146 (9th Cir. 2018); *see also Brunoehler v. Tarwater*, No. 16-56634, 2018 WL 3470210 (9th Cir. July 19, 2018) (unpublished) (declining to extend *Bivens* to claim for unlawful wiretapping); *Zavala v. Rios*, 721 F. App'x 720 (9th Cir. 2018) (unpublished) (declining to extend *Bivens* to claim challenging prison-wide policy regarding handling of unopened mail); *Krug v. Pellicane*, 703 F. App'x 558 (9th Cir. 2017) (unpublished) (dismissing *Bivens* action for failure to allege sufficient facts to prove First Amendment retaliation and not reaching new context analysis). In *Vega*, we declined to extend *Bivens* remedies to an action against private employees for alleged violations of Juan Vega, Jr.'s First and Fifth Amendment rights. 881 F.3d at 1147–48. Vega, a prisoner who was transferred to a residential reentry center to complete the remainder of his prison sentence, sued "federal and private employees [who] conspired to remove him from the halfway house . . . ostensibly based on his race and for asserting his First Amendment rights, by filing a false incident report." *Id.* at 1147. We concluded Vega's claims would require expanding *Bivens* to a new context "because neither the Supreme Court nor we have expanded *Bivens* in the

context meaningfully different is ineluctable. And it is likely for that reason that the district court, and both parties, agree.

## C.

Because Lanuza's claims arise in a new context, we must ask whether there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18). We conclude that the special factors articulated in *Abbasi* do not counsel against extending a *Bivens* remedy to the narrow claim here, where an immigration official and officer of the court forged and submitted evidence in a deportation proceeding to deprive an individual of his right to relief under congressionally enacted laws.

*Abbasi* clarifies the concept of "special factors" by focusing the inquiry on the separation of powers. *Id.* at 1857–58. *Abbasi*'s special factors include: the rank of the officer involved; whether *Bivens* is being used as a vehicle to alter an entity's policy; the burden on the government if such claims are recognized; whether litigation would reveal sensitive information; whether Congress has indicated that it does not wish to provide a remedy; whether there are alternate avenues of relief available; and whether there is adequate deterrence absent a damages remedy, among other factors. *Id.* at 1857–63. But the most important question for us to examine is "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857–58. If "there are sound reasons to

context of a prisoner's First Amendment access to court or Fifth Amendment procedural due process claims arising out of a prison disciplinary process." *Id.* at 1153.

think Congress might doubt the efficacy or necessity of a damages remedy . . . the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id*. at 1858. However, *Abbasi* makes clear that, though disfavored, *Bivens* may still be available in a case against an individual federal officer who violates a person's constitutional rights while acting in his official capacity. *See id.* at 1857.

Applying *Abbasi*'s separation-of-powers principles to this case reveals that there are no "special factors" suggesting *Bivens* remedies should be unavailable. To begin, Lanuza does not challenge high-level executive action. The *Abbasi* Court stressed that "*Bivens* is not designed to hold officers responsible for acts of their subordinates." *Id*. at 1860. "The purpose of *Bivens* is to deter the *officer*[,]" and thus a *Bivens* claim should be "brought against the individual official for his or her own acts, not the acts of others." *Id*. (quoting *F.D.I.C. v. Meyer*, 510 U.S. 471, 485 (1994)). Further, *Bivens* actions against high-ranking executive officers, such as the Director of the Federal Bureau of Investigation and the U.S. Attorney General in *Abbasi*, are disfavored because such suits "would call into question the formulation and implementation of a high-level executive policy, and the burdens of that litigation could prevent officials from properly discharging their duties." *Id.* at 1849. As ICE Assistant Chief Counsel, Love was a low-level federal officer acting as the government's attorney, not the U.S. Attorney General as in *Abbasi*. And strictly comporting with *Bivens*, Lanuza is suing Love for his own actions; he does not seek to hold anyone else, including high-level officials, accountable. Allowing a damages suit to proceed against Love therefore does not raise the same concerns on this score as were present in *Abbasi*.

Relatedly, Lanuza does not challenge or seek to alter the policy of the political branches. *Cf. Abbasi*, 137 S. Ct. at 1860 ("[A] *Bivens* action is not 'a proper vehicle for altering an entity's policy.'" (quoting *Malesko*, 534 U.S. at 74)). While immigration officials have "broad discretion," *Arizona v. United States*, 567 U.S. 387, 396 (2012), no one is arguing that the United States has a policy of allowing federal officers to submit forged government documents to thwart the integrity of immigration proceedings. To the contrary: when Love knowingly forged evidence, his actions violated the INA, which explicitly prohibits the submission of false evidence. *See* 8 U.S.C. § 1357(b) (making the submission of false evidence in immigration proceedings actionable under the federal criminal statute for perjury).

Love argues that all actions taken by immigration officials in the course of their duties—even criminal acts— are necessarily intertwined with the execution of immigration policy. We decline to entertain such a broad reading of immigration law, as the illogical nature of such a reading is demonstrated by the absurdity of its results. If, for example, an immigration official physically forced himself on an asylum-seeker and offered to help her obtain relief if she kept quiet, we would have no trouble concluding that such criminal conduct bears no relationship to the legitimate execution of immigration policy. Likewise, we will not allow an officer of the immigration court to cloak himself in the government's protection when he commits the crimes of forgery and perjury. Indeed, holding accountable an immigration official and officer of the court who engages in domestic criminal activity supports the enforcement of our immigration law in a manner consistent with the intent of the political branches.

*Abbasi* also advised against allowing suits against executive officials because "the burden and demand of litigation might well prevent them—or, to be more precise, future officials like them—from devoting the time and effort required for the proper discharge of their duties." *Abbasi*, 137 S. Ct. at 1860. *Abbasi* noted particular concern for cases in which discovery could reveal "the discussion and deliberations that led to the formation of the policy in question." *Id.* at 1860–61 (citing *Fed. Open Market Comm. v. Merrill*, 443 U.S. 340, 360 (1979)). As this is a straightforward case against a single low-level federal officer, we are not concerned that this litigation will burden the Executive Branch to an unacceptable degree. Further, because the issues in this case involve facts the government itself made publicly available, this lawsuit will not require unnecessary inquiry or discovery into government deliberations or policy making. At most, allowing a lawsuit to proceed in this context would involve the "mere 'disclosure of normal domestic law-enforcement priorities and techniques,'" *Mirmehdi*, 689 F.3d at 983 (quoting *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 490 (1999))—although, since the facts are undisputed, discovery would likely not involve the disclosure of any sensitive government information at all. Indeed, Lanuza's civil suit against Love will likely involve no more investigative intrusion than the criminal prosecution initiated against Love by the United States itself. Accordingly, the fact that the United States saw fit to prosecute Love further supports permitting this lawsuit to proceed.

Similarly, because this case relates only to routine immigration proceedings, expanding *Bivens* to this context does not threaten the political branches' supervision of national security and foreign policy. Quoting our decision in *Mirmehdi*, Love argues that "immigration issues 'have the

natural tendency to affect diplomacy, foreign policy, and the security of the nation,' which further 'counsels hesitation' in extending *Bivens*." *Mirmehdi*, 689 F.3d at 982 (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009)). But *Abbasi* and *Mirmehdi* involved Congressional and Executive Branch policy decisions in response to the biggest terrorist attack in our nation's history. In contrast, the facts of this case show that immigration cases often do not implicate high-level policy decisions related to national security. Lanuza has no ties to terrorism and, as a run-of-the-mill immigration proceeding, his case is unrelated to any other national security decision or interest.

Nor is this a case that has garnered any executive or congressional attention. Compare this case with *Hernandez v. Mesa*, where, upon remand from the Supreme Court, the Fifth Circuit declined to provide *Bivens* remedies to the parents of a fifteen-year-old Mexican citizen who had been fatally shot by a federal law enforcement agent, in part because the United States and Mexican governments had engaged in "serious dialogue" regarding the events at issue in that case. 885 F.3d 811, 820 (5th Cir. 2018). Specifically, Mexico had requested the extradition of the law enforcement agent who shot Hernandez, and the United States had denied this request and refused to indict the agent. *Id*. The Fifth Circuit reasoned that "[i]t would undermine Mexico's respect for the validity of the Executive's prior determinations if, pursuant to a *Bivens* claim, a federal court entered a damages judgment against [the federal officer]." *Id.* Here, in contrast, there is no evidence that any executive official has taken an interest in Lanuza's case, or that his situation has been the subject of diplomatic discussions between the United States and other sovereign nations. The constraints Lanuza seeks mirror the existing Executive Branch policy for federal immigration attorneys, and

therefore a *Bivens* action in this context does not interfere with executive policy by "risk[ing] interference with foreign affairs and diplomacy more generally." *Id.* at 819.

Even so, where, as here, the underlying statutory scheme does not provide a remedy for the injury, we must consider whether Congress's failure to provide a damages remedy is "more than mere oversight" and that "congressional silence" is more than "inadvertent." *Abbasi*, 137 S. Ct. at 1862 (quoting *Schweiker*, 487 U.S. at 423). Though the INA itself lacks a damages remedy, Congress was not silent. Indeed, a comprehensive review of the INA suggests that Congress intended federal criminal and civil laws outside of the Act itself to provide remedies for the misconduct at issue here. As discussed above, the subsection of the INA that addresses the "[p]ower of immigration officers and employees" specifically delegates punishment for submission of false evidence to 18 U.S.C. § 1621, the federal criminal statute for perjury. *See* 8 U.S.C. § 1357(b). Further, the INA addresses the "[p]erformance of [federal] immigration officer functions by [s]tate officers and employees" in 8 U.S.C. § 1357(g)(8). Subsection 8 provides that any state employee "shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law." *Id.* This demonstrates Congress contemplated that civil actions would be maintained against both federal immigration officers and state employees acting in the capacity of federal immigration officers when their actions allegedly violate the Constitution or other laws. In providing a *Bivens* remedy here, we are not attempting to imply "a private remedy" within the INA where "a cause of action does not exist." *Abbasi*, 137 S. Ct. at 1856 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001)) (citations omitted). Instead,

we are "recogniz[ing] an implied cause of action to enforce a provision of the Constitution itself[,]," where "there is no single, specific congressional action to consider and interpret." *Id*. Congress indicated that such constitutional remedies may be pursued when federal immigration officials violate an individual's constitutional rights.

While it is true that there has been "frequent and intense" congressional attention to immigration law generally, that congressional attention does not "suggest[] that Congress has provided what it considers adequate remedial mechanisms for constitutional violations" in this case. *See Schweiker*, 487 U.S. at 423, 425. There is no evidence that Congress has focused on the misconduct here—ICE attorneys intentionally manipulating evidence to deprive immigrants of rights under U.S. laws. To the contrary, Congress presumes that, as a general matter, federal employees faithfully execute federal law, and when they do not, Congress requires those employees be punished for such transgressions.[6] 8 U.S.C. § 1357(b).

*Abbasi* also counseled against allowing a *Bivens* remedy if there is an "alternative, existing process for protecting the

---

[6] If Congress intended all actions taken by an officer while acting pursuant to the INA to be regulated by the INA itself in a separate court, it would have said so. Compare the INA with the Article 3(b) of the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. §§ 801–946, codified at 10 U.S.C. § 803(b), which grants jurisdiction over certain criminal acts to military courts-martial. In the UCMJ, Congress specifically decided that the military would police itself. But when drafting the INA, it decided that traditional Article III jurisdiction was appropriate. Thus, unlike in the UCMJ, in the INA, "Congress ha[s] not foreclosed a damages remedy in 'explicit' terms." *Abbasi*, 137 S. Ct. at 1854 (quoting *Bivens*, 403 U.S. at 397).

[injured party's] interest." *Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) and citing *Bush v. Lucas*, 462 U.S. 367, 385–88 (1983); *Malesko*, 534 U.S. at 73–74; and *Minneci v. Pollard*, 565 U.S. 118, 127–130 (2012)).**[7]**   In *Abbasi*, the Court found that Congress's silence, in conjunction with the plaintiffs' ability to challenge the conditions of their confinement through a successful habeas petition, indicated that Congress intended for plaintiffs to use other judicially available forms of relief. *Id.* at 1862–63.   But there are no such alternative remedial schemes available to Lanuza.   The INA does not provide a remedy for actions by immigration officials that are designed to prevent individuals from accessing its lawful forms of relief.   Lanuza was following the law, using the procedures Congress legislated, until his lawful pursuit of legal permanent resident status was criminally obstructed.   Love's submission of the forged I-826 form completely barred Lanuza from using the INA's remedial scheme.   The Act provides no remedial scheme for forgery if undiscovered. And to be sure, there are other individuals like Lanuza who may also be entitled to relief and who may not have obtained it for this very reason.   While Lanuza was ultimately able to reopen his case, if Lanuza had not, by stroke of luck, found an exceptionally thorough immigration attorney, the forgery might never have been discovered and Lanuza would be

---

**[7]** We note that in *Vega* and *Rodriguez*, this court viewed *Wilkie*'s test for whether there are "alternative remedial structure[s] present" as separate from *Abbasi*'s special-factors analysis. *Vega*, 881 F.3d at 1154; *Rodriguez*, No. 15-16410, 2018 WL 3733428, at \*10 (9th Cir. Aug. 7, 2018).   We read *Abbasi*'s special-factors analysis as encompassing all circumstances that counsel against extending a *Bivens* remedy, including those addressed in *Wilkie*.   Accordingly, we address the "alternative remedial structure[s]" question within our broader special-factors inquiry, but we emphasize that this variance is one of form, not substance.

deported and separated from his U.S. citizen wife and children. The system does not account for actions designed to circumvent it.

The government also argues that the $12,000 Love paid Lanuza in restitution pursuant to his criminal guilty plea is an alternative form of judicial relief. However, criminal prosecutions vindicate the government's interests, not the interests of the victim. The victim does not choose whether to prosecute the case. As such, the criminal law is not an alternative remedial structure designed by Congress for individuals like Lanuza. When Lanuza discovered Love's transgression, he had no right to force the government to prosecute; indeed the government declined to do so until Lanuza brought his *Bivens* action—after Lanuza's immigration proceeding and long after the forgery was discovered. What is more, it is the judge, not the victim, who decides if and how much restitution is appropriate.[8]

With all of these factors in mind, we must now ask "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1858. We recognize that "it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." *Id.* at 1856. We do not take that step lightly. However, we conclude that doing so here is not an improper

---

[8] Lanuza's counsel represented at oral argument that he requested that Lanuza's attorney's fees and expenses be included in the restitution amount, but government counsel rejected the request, saying that Love and the government had agreed that the amount of restitution was "fair."

intrusion into the decisions of other governmental branches where the factors discussed above all suggest that providing a damages remedy is consistent with congressional and executive policy.  Although Congress is often better suited to finding a balance between deterrence of constitutional violations and the costs of allowing a lawsuit to proceed, we do not believe that finding "[t]he proper balance" in this case "is one for the Congress, not the Judiciary, to undertake." *Id.* at 1863.

Judges are particularly well-equipped to weigh the costs of constitutional violations that threaten the credibility of our judicial system.  Indeed, there are few persons better equipped to weigh the cost of compromised adjudicative proceedings than those who are entrusted with protecting their integrity.  And, more often than not, the Judicial Branch, not Congress or the Executive, is responsible for remedying circumstances where a court's integrity is compromised by the submission of false evidence.  Thus, it falls within the natural ambit of the judiciary's authority to decide whether to provide a remedy for the submission of false evidence in an immigration proceeding.

The consequences of allowing the submission of false evidence by government attorneys without repercussion extends beyond its effect on Lanuza.  The magnitude of its societal injury was addressed in the government's press release about Love's conviction: "[D]efendants in immigration court have a 'right to proceedings free from false and fabricated evidence knowingly presented against them.  When that right is denied, a real harm is inflicted both

on society, which loses faith that its government plays fair, and the individual who suffers directly.'"**[9]**

Accordingly, there are compelling interests that favor extending a *Bivens* remedy here, and, on balance, those interests outweigh the costs of allowing this narrow claim to proceed against federal officials. *See Abbasi*, 137 S. Ct. at 1863. The legal standards for adjudicating this claim are well established and administrable. *See Wilkie*, 551 U.S. at 555 (observing that "difficulty in defining a workable cause of action" may be a special factor). Lanuza's claim for denial of procedural due process is a "workable cause of action." *Id.* Whether the evidence was falsified, and whether it was submitted willfully, and whether the submission of that evidence deprived Lanuza of his right to due process, have definite answers, and we have "established methods" to come to these conclusions. *Id.* at 556. Indeed, the administration of Lanuza's case is particularly straightforward because it is undisputed that Love intentionally submitted forged documents, and therefore the only question remaining for the district court is determining the amount of damages to which Lanuza is entitled, an area where our courts have substantial experience.

Finally, we do not foresee a "deluge" of potential claimants seeking to avail themselves of this particular *Bivens* action. *See Davis*, 442 U.S. at 248 (rejecting argument that implying *Bivens* action would cause a deluge of claims). Recognizing a *Bivens* action here will produce

---

**[9]** Ex-ICE Attorney Sentenced to Prison for Falsifying Document in Immigration Case (Apr. 20, 2016), https://www.ice.gov/news/releases/ex-ice-attorney-sentenced-prison-falsifying-document-immigration-case (quoting Assistant U.S. Attorney Matthew Diggs for the Western District of Washington).

widespread litigation only if ICE attorneys routinely submit false evidence, which no party argues is the case. And if this problem is indeed widespread, it demonstrates a dire need for deterrence, validating *Bivens*'s purpose. Moreover, a plaintiff seeking a *Bivens* remedy under this theory must allege sufficient facts to show that a federal official willfully submitted falsified evidence and the submission of this evidence resulted in a complete bar to relief to which the individual was otherwise entitled under congressionally enacted laws. Therefore, frivolous suits will not survive *Ashcroft v. Iqbal*'s heightened pleading requirements. 556 U.S. 662, 678 (2009).

Because providing a *Bivens* remedy does not risk improper intrusion by the judiciary into the functioning of other branches; the judiciary is well-equipped to weigh the costs and benefits of this case; the need for deterrence is substantial; and allowing a lawsuit to proceed will place little burden on the government, it is a proper use of our judicial power to allow this *Bivens* action to proceed.

## III.

There can be no doubt that Love—who intentionally, and illegally, submitted falsified evidence in an immigration hearing—is not protected by qualified immunity, as the district court properly held.[10] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and

---

[10] The district court reasoned, "It should be obvious to any reasonable federal official that submitting false evidence in an immigration proceeding, or in any judicial or quasi-judicial proceeding for that matter, is unlawful and unconstitutional and would undermine the integrity of such a proceeding."

liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quotations and citations omitted). Qualified immunity is not meant to protect those who are "plainly incompetent or those who knowingly violate the law." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). It cannot shield an officer from suit when he intentionally submits a forged document in an immigration proceeding in clear violation of 8 U.S.C. § 1357(b).[11]

## IV.

For these reasons, we hold that a *Bivens* remedy is available here, where a government immigration attorney

---

[11] Love alternatively argues Lanuza's claim is time-barred because the three-year statute of limitations began to run when Lanuza first received the forged I-826 form in May 2009, instead of when Lanuza learned it may have been forged sometime in December/January 2011, or when the forensic examiner confirmed it was forged in February 2012. A *Bivens* claim accrues when the plaintiff knows or has reason to know of the injury that forms the basis of his cause of action, *see Wallace v. Kato*, 549 U.S. 384, 388 (2007), or, in a case involving the submission of fabricated evidence, when the case is "fully and finally resolved," *Bradford v. Scherschligt*, 803 F.3d 382, 388–89 (9th Cir. 2015). Under either analysis, Lanuza's claim was timely. The argument that Lanuza should have known the I-826 form was forged the second he laid eyes on it is absurd. The form was provided by the government—a party normally thought to be trustworthy—which represented that it came from Lanuza's A-file. Moreover, both the BIA and the immigration judge, who review these cases for a living, believed it was authentic. Lanuza should not be held to a higher standard.

intentionally submitted a forged document in an immigration proceeding to completely bar an individual from pursuing relief to which he was entitled. Failing to provide a narrow remedy for such an egregious constitutional violation would tempt others to do the same and would run afoul of our mandate to enforce the Constitution.

At its core, this case is about a lie, and all the ways it was used, over several years, to defraud the courts. Government attorneys are given great power, and with that power comes great responsibility. These attorneys represent the United States, and when they act, they speak for our government. "[T]he federal courts have an obligation to set their face against enforcement of the law by lawless means or means that violate rationally vindicated standards of justice, and to refuse to sustain such methods by effectuating them. . . . Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake." *Sherman v. United States*, 356 U.S. 369, 380 (1958) (Frankfurter, J., concurring); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 594 n.19 (1980) (Brennan, J., concurring) (quoting *Sherman*).

**AFFIRMED IN PART, REVERSED IN PART, REMANDED.**[12]

---

[12] Appellant's motion for judicial notice (Docket no. 30) is **GRANTED**. Costs are awarded to Lanuza under FRACP 39(a)(4).