**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FIRDOS SHEIKH,

       *Plaintiff-Appellant*,

  v.

U.S. DEPARTMENT OF
HOMELAND SECURITY; CAROL
WEBSTER, Special Agent of U.S;
EUGENE KIZENKO, DHS Special
Agent,

       *Defendants-Appellees*.

No. 22-16983

D.C. No.
2:22-cv-00409-
WBS-AC

OPINION

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted February 5, 2024
San Francisco, California

Filed July 5, 2024

Before: Ryan D. Nelson, Danielle J. Forrest, and Gabriel
P. Sanchez, Circuit Judges.

Opinion by Judge Sanchez;
Concurrence by Judge R. Nelson

# SUMMARY[*]

## *Bivens*

The panel affirmed the district court's dismissal of Dr. Firdos Sheikh's Fourth and Fifth Amendment claims brought under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against former special agents with the Department of Homeland Security Investigations (HSI) alleging that defendants fabricated evidence in a search warrant affidavit and submitted misleading reports to prosecutors that resulted in Dr. Sheikh's arrest and criminal prosecution.

Applying the two-step framework set forth in *Ziglar v. Abbasi*, 582 U.S. 120 (2017), to determine whether implied causes of action existed, the panel held, at step one, that Dr. Sheikh's Fourth and Fifth Amendment claims alleging fabrication of evidence presented a new context because they meaningfully differed from the cases in which the Supreme Court implied a damages action.

At step two of the *Abbasi* framework, the panel held that there were several special factors indicating that the Judiciary was at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed. Permitting the *Bivens* claims would risk intrusion into the Executive Branch's prosecutorial decision-making process; the claims were leveled against agents of HSI, who investigate immigration and cross-border criminal activity; and alternative remedial structures existed. The

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel rejected Dr. Sheikh's argument that pursuant to *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018), the Judiciary was better equipped than Congress to create a damages remedy for falsification of evidence in judicial proceedings, noting that *Lanuza* involved markedly difference circumstances.

Concurring, Judge R. Nelson wrote separately to address the continued viability of *Lanuza*, which the majority recognized does not support plaintiff's *Bivens* claim. *Lanuza* should be read and applied narrowly, and should be overruled en banc when the opportunity presents itself.

## COUNSEL

Yasin M. Almadani (argued), Almadani Law, Newport Beach, California; Ahmed Ibrahim, AI Law PLC, Newport Beach, California; for Plaintiff-Appellant.

Joseph B. Frueh (argued), Assistant United States Attorney; Phillip A. Talbert, United States Attorney; Eastern District of California, Office of the United States Attorney, Sacramento, California; for Defendants-Appellees.

## OPINION

SANCHEZ, Circuit Judge:

Plaintiff Doctor Firdos Sheikh appeals from the district court's dismissal of her Fourth and Fifth Amendment claims brought under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against defendants Carol Webster and Eugene Kizenko, former special agents with the Department of Homeland Security Investigations (HSI). Dr. Sheikh alleges that defendants fabricated evidence in a search warrant affidavit and submitted misleading reports to prosecutors that resulted in her arrest and criminal prosecution. Applying the Supreme Court's two-step framework articulated in *Ziglar v. Abbasi*, 582 U.S. 120 (2017), the district court concluded that Dr. Sheikh's claims arose in a new context and that special factors counselled against extending a *Bivens* damages remedy to her claims. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.

Because the district court dismissed Dr. Sheikh's claims at the motion to dismiss stage, we accept as true the facts as alleged in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## A.

On July 1, 2013, HSI agents Webster and Kizenko conducted a warrantless search of Dr. Sheikh's 20-acre ranch in Elk Grove, California, investigating a lead about

workers being held against their will.[1]  During the search, defendants interviewed three undocumented men, named "Gildardo," "Prakash," and "Alfredo," who worked for Dr. Sheikh and claimed to be victims of human trafficking. According to Dr. Sheikh, the three men made statements that were materially inconsistent with each other's, and were at odds with defendants' observations of the working conditions on the ranch.  For example, Prakash and Alfredo stated that they were forced to work 10-to-12-hour days, seven days a week, and were not free to leave because the gates to the property were secured with chains and padlocks. However, defendants observed that the men could walk on and off the property freely and their investigation revealed there was significantly less work to do than what the men asserted.

On July 8, 2013, Agent Kizenko obtained a search warrant for Dr. Sheikh's ranch, making numerous materially false statements in the search warrant application.  After conducting a second search of the ranch, defendants wrote reports for prosecutors that intentionally omitted exculpatory evidence and credited Prakash and Alfredo's clearly false and exaggerated statements that they were held against their will and forced into labor by Dr. Sheikh. Defendants also supported Prakash and Alfredo's T-Visa applications to secure their presence in the United States to testify against Dr. Sheikh.[2]  In the process of supporting their

---

[1] HSI is the principal investigative arm of the U.S. Department of Homeland Security (DHS).  Dr. Sheikh does not challenge the constitutionality of this initial search.

[2] T-Visas offer protection to human trafficking victims, such as temporary immigration benefits enabling victims to remain in the United

T-Visa applications, Agent Webster provided perjurious certifications to the United States Citizenship and Immigration Services indicating that Prakash and Alfredo endured sweatshop-style working hours on a locked-down compound.

**B.**

In June 2018, Dr. Sheikh was charged with two counts of trafficking with respect to forced labor under 18 U.S.C. § 1590(a), two counts of harboring for financial gain under 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (a)(1)(B)(i), one count of obstructing a forced labor investigation under 18 U.S.C. § 1590(b), and one count of making false statements under 18 U.S.C. § 1001. The charges arose from Alfredo and Prakash's allegations that Dr. Sheikh harbored them and forced them to work on her property between 2008 and 2013 through various means. The charges were eventually dismissed in October 2020. Because the district court's dismissal of the charges gave rise to Dr. Sheikh's *Bivens* claims, we discuss what transpired in those proceedings.

Dr. Sheikh moved to dismiss the indictment based on the government's failure to disclose exculpatory evidence that undermined the government's claim that she had employed physical force, restraint, harm, or threats against Prakash and Alfredo. *See Brady v. Maryland*, 373 U.S. 83 (1963).[3]

_____

States, in exchange for assisting law enforcement with the prosecution of human trafficking. *See Victims of Human Trafficking: T Nonimmigrant Status*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status (last visited June 4, 2024).

[3] "To establish a *Brady* violation, a defendant must show that: (1) the evidence at issue is favorable to the accused, either because it is

Following an evidentiary hearing, the district court denied Dr. Sheikh's motion to dismiss. Although the court concluded that the government should have disclosed material evidence tending to show that the alleged victims were free to leave the premises of their own accord and did not work 12-to-14-hour days, the court declined to dismiss the indictment. The district court determined that dismissal was not appropriate because the government had disclosed the exculpatory evidence well in advance of trial, the government attorneys did not appear to have made any intentionally or recklessly false statements to the court, and the previously undisclosed material was not as obviously *Brady* material as in other cases warranting dismissal. To limit the impact of the government's untimely disclosure, the district court postponed hearings and expressed a willingness to reopen proceedings on the pretrial motions already decided.

In August 2020, the district court denied Dr. Sheikh's amended motion to suppress evidence arising out of the July 9, 2013, search of her property. Dr. Sheikh alleged that the search warrant application omitted key facts which tended to undermine the warrant affidavit's portrayal of forced labor and jail-like conditions, in violation of *Franks v. Delaware*, 438 U.S. 154 (1978).[4] After conducting a *Franks* hearing,

---

exculpatory or because it is impeaching; (2) the evidence was suppressed by the government, regardless of whether the suppression was willful or inadvertent; and (3) the evidence is material to the guilt or innocence of the defendant." *United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013).

[4] To prove a *Franks* violation, the defendant must show that (1) the government intentionally or recklessly made false or misleading statements or omissions in its warrant application and (2) these false or

the district court expressed "grave[]" concerns about certain omissions in the warrant affidavit that cast "some doubt" on Prakash and Alfredo's credibility.  The court determined that Agent Kizenko recklessly omitted certain facts from the search warrant application and should have known that his affidavit overstated the gravity of the physical force, restraint, harm or threats used by Dr. Sheikh against Prakash and Alfredo.  Notwithstanding these omissions, the district court found that probable cause supported a search of Dr. Sheikh's property and denied her *Franks* motion.  The district court observed that forced labor under 18 U.S.C. § 1589 may be established by means other than physical violence, and there was a "fair probability" that a search of Dr. Sheikh's property would result in "evidence of forced labor via financial or immigration harm."

On October 9, 2020, upon Dr. Sheikh's motion, the district court dismissed without prejudice her indictment under the Speedy Trial Act, 19 U.S.C. § 3161.  The district court reasoned that the ends of justice required dismissal because, had the government timely disclosed all *Brady* material, the case would have proceeded to trial before the suspension of all trials in the district occasioned by the COVID-19 pandemic.  The government did not re-indict Dr. Shiekh.

## C.

In March 2022, Dr. Sheikh brought a civil action asserting two *Bivens* claims against defendants: Fourth and Fifth Amendment violations based on her arrest and prosecution, respectively, resulting from defendants'

---

misleading statements or omissions were necessary to finding probable cause.  *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017).

fabrication of evidence.[5]  In August 2022, defendants moved to dismiss Dr. Sheikh's claims primarily arguing that they presented an improper extension of *Bivens*.  In November 2022, after holding a hearing on the motion, the district court granted defendants' motion to dismiss with prejudice.

In dismissing Dr. Sheikh's claims against defendants, the district court employed *Abbasi*'s two-step test, which the Supreme Court clarified in *Egbert v. Boule*, 596 U.S. 482 (2022), to determine whether an implied cause of action exists under *Bivens* outside of the narrow contexts the Court has already recognized.  Applying *Abbasi* and *Egbert*, the district court held that Dr. Sheikh's claims arose in a new context and that special factors indicated that Congress is better suited to weigh the costs and benefits of allowing a damages action to proceed.  As for the special factors counseling against extending *Bivens* to Dr. Sheikh's claims, the district court emphasized "[f]oremost" the existence of remedial processes provided by the administrative complaint procedures in 8 C.F.R. § 278.10(a)–(b) and the Hyde Amendment, Pub L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (codified at 18 U.S.C. § 3006A Note).  Relying on *Egbert*, the district court further determined that allowing a *Bivens* claim against DHS employees could have potentially systemwide consequences for DHS's ability to investigate and prosecute cross-border human trafficking and enforce immigration laws.  Ultimately, the district court rejected Dr. Sheikh's invitation to permit *Bivens* claims against defendants for fabrication of evidence, concluding that "Congress . . . is much better equipped than the courts

---

[5] Dr. Sheikh also brought the two claims against DHS, which the district court dismissed for lack of subject matter jurisdiction—a ruling that Dr. Sheikh does not appeal.

to fashion a remedy tailored to address this particular concern." The district court dismissed Dr. Sheikh's claims without leave to amend.

## II.

"We review de novo a district court's order granting a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 652 (9th Cir. 2019).

Congress has not created a private right of action to redress constitutional violations committed by federal officers. Over fifty years ago, the Supreme Court in *Bivens* recognized an implied cause of action under the Fourth Amendment, permitting the plaintiff to seek damages against agents from the Federal Bureau of Narcotics for an allegedly unreasonable search and seizure at the plaintiff's home. 403 U.S. at 396–97. Within a decade, the Supreme Court recognized an implied damages cause of action under *Bivens* on two other occasions. In *Davis v. Passman*, 442 U.S. 228, 230–31 (1979), the Court provided a *Bivens* remedy for a Fifth Amendment sex-discrimination claim against a sitting member of Congress. And in *Carlson v. Green*, 446 U.S. 14, 16–18 (1980), the Court recognized a *Bivens* remedy for a prisoner's Eighth Amendment claim arising from prison officials' failure to provide proper medical attention. In the four decades since *Carlson*, however, the Supreme Court has taken a significantly more restrained approach to *Bivens* claims, cautioning that "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity." *Abbasi*, 582 U.S. at 121 (quoting *Iqbal*, 556 U.S. at 675).

We are guided by *Abbasi*'s two-step framework to determine whether a plaintiff should be afforded a cause of

action under *Bivens*.  *See id*. at 135–37; *Egbert*, 596 U.S. at 492–93.  "First, we ask whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningful[ly]' different from the three cases in which the Court has implied a damages action."  *Egbert*, 596 U.S. at 492 (alteration in original) (quoting *Abbasi*, 582 U.S. at 139).  "Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'"  *Id.* (quoting *Abbasi*, 582 U.S. at 136).  Although there are two steps to the analysis, "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy."  *Id.*

**A.**

Under the first step of the *Abbasi* framework, a case presents a new context if it "is different in a meaningful way from previous *Bivens* cases decided by [the] Court."  *Abbasi*, 582 U.S. at 139.  Meaningful differences may include, for example, "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider."  *Id.* at 139–40.  "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized," *Hernandez v. Mesa*, 589 U.S. 93, 103 (2020), for "even a modest extension is still an extension," *Abbasi*, 582 U.S. at 147.

Dr. Sheikh's Fourth and Fifth Amendment claims based on defendants' alleged fabrication of evidence arise in a new context from *Bivens*, *Davis*, and *Carlson*. Dr. Sheikh's Fourth Amendment claim involves a new category of defendants operating under a different legal mandate as compared to *Bivens*—both meaningful differences under *Abbasi*. While the Fourth Amendment claim in *Bivens* was against Federal Bureau of Narcotics agents, Dr. Sheikh brings her claim against HSI agents investigating illegal cross-border movement. Dr. Sheikh "does not point to any reason to believe that most federal agencies have the same or similar legal mandates, or more to the point, that [DHS] has the same mandate as agencies enforcing federal anti-narcotics law." *Mejia v. Miller*, 61 F.4th 663, 668 (9th Cir. 2023); *see Pettibone v. Russell*, 59 F.4th 449, 455 (9th Cir. 2023) (holding that the plaintiffs' Fourth Amendment claims presented a new *Bivens* context due to differing legal mandates between an officer of the Federal Protective Service and the Federal Bureau of Narcotics). Such differences alone make this a new *Bivens* context.

Dr. Sheikh's Fourth Amendment claim also arises from distinctly different misconduct than that alleged in *Bivens*. Indeed, Dr. Sheikh's allegations bear little resemblance to the warrantless search and seizure in *Bivens* where "agents manacled petitioner in front of his wife and children, and threatened to arrest the entire family." 403 U.S. at 389. Rather, Dr. Sheikh alleges that defendants "procured and submitted false evidence against [her] to have her indicted on fabricated charges of human trafficking." As the Eighth Circuit recently explained, "[t]hese information-gathering and case-building activities"—at the heart of Dr. Sheikh's claims—"are a different part of police work than the apprehension, detention, and physical searches at issue in

*Bivens*." *Farah v. Weyker*, 926 F.3d 492, 499 (8th Cir. 2019).

Finally, Dr. Sheikh's Fourth Amendment claim describes a "mechanism of injury" that meaningfully differentiates her case from *Bivens.* *See id.* (analyzing whether defendant directly or indirectly caused plaintiff's injury to determine if *Bivens* claim arises in a new context). The *Bivens* plaintiff alleged "great humiliation, embarrassment, and mental suffering" as a direct result of the agents' misconduct. 403 U.S. at 389–90. In contrast, Dr. Sheikh's alleged injury arises from defendants' indirect act of supplying misleading information to other institutional actors, such as prosecutors, the grand jury, and the magistrate judge who approved the search warrant. In turn, those legal actors made independent decisions based on the defendants' information, ultimately resulting in Dr. Sheikh's arrest and prosecution. The indirect relationship between the defendants' acts and the harm suffered by Dr. Sheikh further distinguishes her Fourth Amendment claim from the one in *Bivens*.

Many of our sister circuits to have considered claims like Dr. Sheikh's have determined that they present a new *Bivens* context.[6] We join the weight of consensus in concluding that

---

[6] *See, e.g.*, *Quinones-Pimentel v. Cannon*, 85 F.4th 63, 71 (1st Cir. 2023) (finding new context where plaintiff claimed federal agents fabricated evidence to acquire a search warrant); *Xi v. Haugen*, 68 F.4th 824, 834 (3d Cir. 2023) (finding new context where federal agents allegedly made false statements and material omissions of exculpatory evidence that led government to investigate, arrest, and prosecute plaintiff); *Annappareddy v. Pascale*, 996 F.3d 120, 135 (4th Cir. 2021) (finding new context where federal investigators allegedly falsified search warrant affidavit and evidence to obtain arrest warrant and indictment);

allegations of fabrication of evidence related to a criminal prosecution meaningfully differ from the allegations in *Bivens* such that they present a new context.

Dr. Sheikh does not attempt to draw a parallel between her Fifth Amendment claim and the sex-discrimination claim at issue in *Davis*, 442 U.S. at 230. Instead, Dr. Sheikh argues that her Fifth Amendment claim does not arise in a new context because of our decision in *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018). In *Lanuza*, we held that a *Bivens* remedy existed against a U.S. Immigration and Customs Enforcement (ICE) attorney who falsified documents before an immigration court in violation of the plaintiff's Fifth Amendment right to due process. *Id.* at 1021. However, the Supreme Court has made clear that a context is "new" if it is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court," rather than any lower court. *Abbasi*, 582 U.S. at 139.

"[O]nce we look beyond the constitutional provisions invoked in *Bivens*, *Davis*, and the present case, it is glaringly obvious that [Dr. Sheikh's] claims involve a new context, *i.e.*, one that is meaningfully different." *Hernandez*, 589 U.S. at 103. Therefore, applying *Abbasi*'s instruction, we hold that Dr. Sheikh's Fourth and Fifth Amendment claims arise in a new context under *Bivens*.

**B.**

The second step of the *Abbasi* framework requires us to ask if there are "'special factors' indicating that the Judiciary

---

*Farah*, 926 F.3d at 498 (finding new context where federally deputized officer allegedly duped prosecutors and grand jury to indict plaintiff); *Cantú v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019) (finding new context where plaintiff alleged that federal officers falsified affidavits).

is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (quoting *Abbasi*, 582 U.S. at 136). The Court has cautioned that the "inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action." *Id.* at 496. Rather, "[a] court faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting *Abbasi*, 582 U.S. at 136). "If there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Id.* at 492 (quoting *Hernandez*, 589 U.S. at 102).

In this case, several special factors counsel hesitation in extending *Bivens* to Dr. Sheikh's claims. First, Dr. Sheikh's claims implicate unanswered questions that risk intrusion into the Executive Branch's investigative and prosecutorial functions. The success of Dr. Sheikh's Fourth and Fifth Amendment claims, as alleged, turns on whether she was arrested and prosecuted because of defendants' misstatements and omissions. To determine whether defendants' misconduct caused Dr. Sheikh's injuries requires review of a causal sequence of events, including defendants' production of evidence to prosecutors, prosecutors' internal charging decisions, prosecutors' presentation of evidence to the grand jury, and the grand jury's internal deliberations leading to its decision to indict Dr. Sheikh.[7] Delving into these matters would require

---

[7] Dr. Sheikh misreads defendants' position to be that "the grand jury is an investigative arm of the Executive." Defendants make no such

determining what evidence was placed before prosecutors or the grand jury and whether defendants' allegedly false or misleading statements and omissions were material to the decisions made by each of these institutional actors. *See Farah*, 926 F.3d at 499 ("Only then, after probing executive charging decisions and peeking behind the curtain of customarily secret grand-jury proceedings, would the plaintiffs be able to prove their cases."). This sort of probing by the Judiciary is far more intrusive than what *Bivens* required. In fact, we "likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*" that necessitates the court encroaching on the Executive's investigative and prosecutorial functions in this manner, and "[t]hat uncertainty alone is a special factor that forecloses relief." *Egbert*, 596 U.S. at 493 (quoting *Abbasi*, 582 U.S. at 136).

Dr. Sheikh contends that permitting her *Bivens* claims would not be an intrusion into the Executive Branch's decision-making process because defendants' actions resulted in a fraud upon the court. As an initial matter, Dr. Sheikh's concern for the integrity of the court in this case is not well-founded. Dr. Sheikh brought the issues on which she bases her *Bivens* claims to the attention of the district court. After holding *Brady* and *Franks* hearings on the exculpatory evidence and omissions giving rise to Dr. Sheikh's claims, the district court declined Dr. Sheikh's request to dismiss the criminal case or to suppress evidence

---

assertion. They correctly point out, however, that disturbing the usual secrecy of the grand jury proceedings risks intrusion on the Executive's authority to enforce laws and prosecute crimes. *See United States v. Index Newspapers LLC*, 766 F.3d 1072, 1084 (9th Cir. 2014) ("Because the grand jury is an integral part of the criminal investigatory process, these proceedings are always held in secret.").

arising from the July 9, 2013, search of her property.  To the extent Dr. Sheikh argues that the "Judiciary [must] . . . prescribe a *Bivens* remedy to ensure that any conduct that would undermine the integrity of its proceedings and institution be deterred," such argument misconstrues which party's interest is at stake here: an implied right of action under *Bivens* creates a remedy for Dr. Sheikh, not the Judiciary.

Second, hesitation is warranted because Dr. Sheikh brings her claims against HSI agents responsible for investigating transnational crime and threats related to human trafficking.  In *Egbert*, the Court determined that "national security [was] at issue" where the defendant federal officer was "carrying out Border Patrol's mandate" of investigating unlawful cross-border activity when the alleged altercation occurred.  596 U.S. at 494.  The Court reaffirmed that "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."  *Id.* (alteration in original) (quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)).  This case does not so "obviously" implicate national security concerns as did *Egbert*, where the Border Patrol officer's conduct occurred "several feet from . . . the border."  *Id.* at 496.  Nevertheless, Dr. Sheikh's claims against HSI agents give us reason to pause based on the type of investigations HSI carries out and their foreign policy implications.

*Egbert* instructed that the question is not whether a court is competent to authorize a *Bivens* claim against a specific agent, but against that federal agency's agents generally.  *Id.* As illustrated by the criminal charges brought against Dr. Sheikh, HSI agents, among other things, conduct human trafficking investigations.  In enacting the Trafficking Victims Protection Act (TVPA) of 2000, Pub. L. No. 106-

386, 144 Stat. 1464 (2000), aimed at combatting human trafficking, Congress declared that "[t]he United States and the international community agree that trafficking in persons involves grave violations of human rights and is a matter of *pressing international concern*."**[8]**  22 U.S.C. § 7101(b)(23) (emphasis added).  In the TVPA, Congress further found that "[s]uch trafficking is the fastest growing source of profits for organized criminal enterprises worldwide," *id.* § 7101(b)(8), and "[t]he United States must work bilaterally and multilaterally to abolish the trafficking industry by taking steps to promote cooperation among countries linked together by international trafficking routes," *id.* § 7101(b)(24).    Given that HSI's human trafficking investigations directly bear on a decidedly "pressing international concern," *id.* § 7101(b)(23), there is "reason to think that 'judicial intrusion' into [this] field might be 'harmful' or 'inappropriate,'" *Egbert*, 596 U.S. at 496 (quoting *United States v. Stanley*, 483 U.S. 669, 681 (1987)).

Third, as the district court correctly recognized, the existence of two alternative remedial structures weighs against extending *Bivens* here: (1) DHS's requirement under 8 C.F.R. § 287.10 to investigate alleged violations of the standard for enforcement activities and (2) the Hyde Amendment.  *See id.* at 483 ("[A] court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" (quoting *Abbasi*, 582 U.S. at 137)).

---

[8] With the passage of the TVPA, Congress created the T-Visa for which Prakash and Alfredo applied, relying on Agent Webster's certification of their forced working conditions.  *See* 22 U.S.C. § 7105 (codified at 8 U.S.C. § 1101(a)(15)(T)).

Under 8 C.F.R. § 287.10(a), "[a]lleged violations of the standards for enforcement activities established in accordance with the provisions of § 287.8 shall be investigated expeditiously consistent with the policies and procedures of [DHS]."[9]   Any person wishing to lodge a complaint that an officer has violated the enforcement standards set out in section 287.8 may contact the DHS Office of the Inspector General.  8 C.F.R. § 287.10(b).  In turn, section 287.8 applies to "every immigration officer involved in enforcement activities," and provides in pertinent part that "[a]dequate records must be maintained noting the results of every site inspection," *id.* § 287.8(f)(3), that "[a]n arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States," *id.* § 287.8(c)(2)(i), and that the standards for enforcement activities incorporate "all applicable guidelines and policies of . . . [DHS]," *id.* § 287.8(g).

It can hardly be said, as Dr. Sheikh characterizes it, that her "constitutional claims . . . have no relationship to these enforcement standards."   Although the enumerated standards of enforcement activities under section 278.8 do not directly address evidence-gathering protocols, Dr. Sheikh could have filed a complaint with DHS alleging that defendants' site inspections records were inadequate—in that the records made omissions or misstatements—or that defendants included false information in their probable cause statements and, thus, had no reasonable basis to arrest her.

---

[9] Notably, *Egbert* cited section 287.10 as an alternative available remedy foreclosing an extension of *Bivens*.  596 U.S. at 497–98.

Dr. Sheikh's argument that section 287.10(b) affords her no relief because defendants are now retired misses the mark. Although section 287.10 does not currently provide Dr. Sheikh with a remedy, "[t]hat the alternative remedy existed at all is the factor we consider under *Egbert*." *Chambers v. C. Herrera*, 78 F.4th 1100, 1107 n.3 (9th Cir. 2023); *see Mejia*, 61 F.4th at 665, 669 (holding that the ability to report misconduct against a since-retired federal officer was a sufficient alternative scheme precluding a *Bivens* remedy). Nothing in the text of section 287.10 prohibits a person from lodging a complaint if the related case is pending before a court. And Dr. Sheikh provides no explanation why she did not avail herself of the grievance procedure under section 287.10 prior to defendants' retirement. Thus, we conclude that section 287.10 provides an alternative remedial structure.

The second remedial scheme relevant to Dr. Sheikh's *Bivens* claims is the Hyde Amendment. "The Hyde Amendment provides that in a privately defended criminal case, the court 'may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith . . . .'" *United States v. Chapman*, 524 F.3d 1073, 1088 (9th Cir. 2008) (quoting 18 U.S.C. § 3006A Note). Although the Hyde Amendment does not explicitly define "prevailing party," we have interpreted that term to refer to the party that "receive[d] at least some relief *on the merits* of his claim." *Id.* at 1088–89 (alteration in original) (quoting *United States v. Campbell*, 291 F.3d 1169, 1172 (9th Cir. 2002)).

Dr. Sheikh argues that we should not consider the Hyde Amendment a relevant remedial structure because she

cannot seek relief under it as the district court did not dismiss her criminal case on the merits. Dr. Sheikh is correct that in *Egbert* the Supreme Court held that a *Bivens* action was independently foreclosed because "Congress ha[d] provided alternative remedies for aggrieved parties in [plaintiff's] position." 596 U.S. at 497. However, *Egbert* also instructed that "the absence of relief does not by any means necessarily imply that courts should award money damages" since courts "defer to congressional inaction if the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms." *Id.* at 501 (internal quotation marks and citations omitted). Said differently, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Abbasi*, 582 U.S. at 137.

On this point, *Chambers* is instructive. In *Chambers*, we declined to extend *Bivens* to an inmate's Eighth Amendment failure-to-protect claim in part because the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e, provided an alternative remedial structure. 78 F.4th at 1106–07. Although the PLRA did not provide relief for the plaintiff's specific Eighth Amendment claim, we determined that "the lack of a favorable remedy is immaterial to whether an alternative remedial structure exists that precludes judicial intervention under *Bivens*." *Id.* at 1106. In doing so, we observed that "any decision by Congress or the Executive not to create an express Eighth Amendment failure to protect cause of action for prisoners, where it has legislated, suggests that they have decided against creating such an

action." *Id.* at 1107. Accordingly, "[s]o long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Id.* at 1106 (quoting *Egbert*, 596 U.S. at 498). The fact that the Hyde Amendment provides a remedy for the exact harm that Dr. Sheikh allegedly suffered—bad-faith prosecution—but does not provide relief to Sheikh in her specific circumstance weighs against extending *Bivens* to her claims. *See Farah*, 926 F.3d at 502 ("The fact that Congress has expressly provided a damages remedy for some victims of [a] particular type of injury, but not for others, suggests that it considered the issue and made a deliberate choice.").

Dr. Sheikh's reliance on *Lanuza* to argue that the Judiciary is better equipped than Congress to create a damages remedy for falsification of evidence in judicial proceedings is misplaced. The falsified evidence in *Lanuza* arose in a markedly different circumstance than Dr. Sheikh's and it was that circumstance in *Lanuza* that drove our reasoning. Indeed, in *Lanuza* we concluded that special factors did not counsel against extending a *Bivens* remedy to the "narrow claim" where "an immigration official and officer of the court forged and submitted evidence in a deportation proceeding" before the immigration court. 899 F.3d at 1028. Moreover, we recognized that "the administration of Lanuza's case [was] particularly straightforward because it [was] undisputed that [an ICE attorney] intentionally submitted forged documents, and therefore the only question remaining for the district court [was] determining the amount of damages to which Lanuza [was] entitled." *Id.* at 1033. Dr. Sheikh's case is not nearly so straightforward. As discussed above, Dr. Sheikh alleges

that defendants' actions injured her "through a series of intervening steps" involving "decisions by independent legal actors," including the prosecutors who chose to pursue charges against her. *Farah*, 926 F.3d at 499. Given that the similarities between *Lanuza* and the instant case begin and end with allegations that evidence was fabricated, *Lanuza* does not control our decision here.

It bears repeating, *Egbert* made clear that we must inquire "whether there is *any* rational reason . . . to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" 596 U.S. at 496 (quoting *Abbasi*, 582 U.S. at 136). Dr. Sheikh's case provides several: the risk of intrusion into the Executive Branch's prosecutorial decision-making process; that Dr. Sheikh's claims are leveled against agents of HSI, who investigate immigration and cross-border criminal activity; and the existence of alternative remedial structures.

## III.

For these reasons, we conclude that Dr. Sheikh's Fourth and Fifth Amendment claims based on allegations that defendants fabricated evidence resulting in her arrest and prosecution present a new context under *Bivens* and that special factors counsel hesitation in extending an implied cause of action here. Accordingly, we affirm the district court's order granting defendants' motion to dismiss the complaint for failure to state a claim.

**AFFIRMED.**

R. Nelson, J., concurring:

I join the majority opinion. I write separately to address the continued viability of *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018), which the majority recognizes does not support plaintiff's *Bivens* claim.

In *Lanuza*, an attorney with Immigration and Customs Enforcement (ICE), "intentionally" forged and submitted government documents to an immigration court in violation of the plaintiff's Fifth Amendment due process right. *Id.* at 1021. We held that, even with no express statutory cause of action, an implied cause of action under *Bivens* could be asserted against the ICE attorney. *Id*. And although we recognized that the plaintiff's claim arose in a new context, we held that there were no "special factors" suggesting a *Bivens* remedy should be unavailable. We so concluded because, among other things, the case did not risk unduly burdening the Executive Branch and the plaintiff sought neither to hold high-level officials accountable nor to alter the policy of the political branches. *Id.* at 1028–29. And although we recognized that the Immigration and Nationality Act did not provide a remedy for the injury, *id*. at 1030, we held that a *Bivens* remedy—damages—were available. *Id.* at 1033–34.

A few years later, in *Egbert v. Boule*, the Supreme Court "made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." 596 U.S. 482, 486 (2022). Although the Court did not overrule *Bivens*, it made clear that *Bivens*' two-step test boiled down to one main question: "whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id*. at 492. Applying that test, the Court concluded that Congress was better positioned to

create remedies when, as there, border security was implicated in the plaintiff's claim. *Id.* at 494–95.

Because *Egbert* did not eliminate the "special factors" test, *Lanuza* is not so inconsistent with *Egbert* that it can be overruled by a three-judge panel. *See Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc). But that does not mean that *Lanuza* was correct even pre-*Egbert*. I have serious doubts that it was. At any rate, the reasoning in *Lanuza* is impossible to defend post-*Egbert*.

Congress is better positioned to create remedies in the context of immigration, and it has established a "substantial, comprehensive, and intricate remedial scheme" to do so. *Mirmehdi v. United States*, 689 F.3d 975, 982 (9th Cir. 2012) (quoting *Arar v. Ashcroft*, 585 F.3d 559, 572 (2d Cir. 2009) (en banc)) (internal quotation marks omitted). Congress's silence about a remedy for the plaintiff's injury in *Lanuza* should therefore give us pause. *Lanuza* should be read and applied narrowly. It should also be overruled en banc when the opportunity presents itself.