**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PAUL SCHWARTZ, | No. 23-1343 |
| *Plaintiff - Appellant*, | D.C. No. 4:14-cv-02013-JAS |
| v. | |
| D MILLER, P.A., Acting HSA; Unknown UNKNOWN TATAD, named as Ms. Tatad, M.L.P; BECKY CLAY, Warden; Unknown UNKNOWN AKINS, named as Ms. Akins, M.D.; THOMAS LONGFELLOW, M.D., Clinical Director; Unknown UNKNOWN LAMB, named as Mr. Lamb, Associate Warden; UNKNOWN ENGLAND, named as Ms. England, Acting Hospital Administrator; UNKNOWN ASH, named as Ms. Ash, M.D., | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the District of Arizona
James Alan Soto, District Judge, Presiding

Argued and Submitted November 8, 2024
Phoenix, Arizona

Filed August 28, 2025

Before: Richard A. Paez and John B. Owens, Circuit
Judges, and Richard Seeborg, Chief District Judge.[*]

Opinion by Judge Paez

## SUMMARY[**]

### Prisoner / *Bivens*

The panel reversed the district court's judgment on the
pleadings for federal prison officials in Paul Schwartz's
*Bivens* action alleging that the prison officials were
deliberately indifferent to his serious medical needs in
failing to treat adequately a litany of serious symptoms over
the course of eighteen months.

Applying the first step of the two-step framework set
forth in *Ziglar v. Abasi*, 582 U.S. 120 (2017), the panel held
that Schwartz's claim was "identical in all meaningful
respects" to *Carlson v. Green*, 446 U.S. 14 (1980), in which
the Supreme Court first recognized a *Bivens* claim under the
Eighth Amendment for deliberate indifference to serious

---

[*] The Honorable Richard Seeborg, United States Chief District Judge for
the Northern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

medical needs. Because this case does not meaningfully differ from *Carlson*, Schwartz has a *Bivens* remedy under that precedent.

The panel rejected defendants' arguments that the Prison Litigation Reform Act (PLRA), the availability of the Bureau of Prisons' Administrative Remedy Program (ARP), and certain factual features of Schwartz's claims were meaningfully different from *Carlson* and therefore constituted special factors at step one that placed Schwartz's claim within a new *Bivens* context. First, the PLRA did not eliminate existing *Bivens* claims but rather was intended to govern such claims. Second, the ARP was in place when *Carlson* was decided and is only relevant at step two of the *Ziglar* framework. Third, the severity of harm or misconduct was not a meaningful difference distinguishing the context of Schwartz's claims from the context presented in *Carlson.*

Because Schwartz's claims arose from the same context presented in *Carlson*, they are cognizable under *Bivens*, and no step two analysis is required.

Finally, the panel held that the district court abused its discretion in denying Schwartz leave to amend his complaint without providing adequate written findings and with no clear basis for the denial in the record.

## COUNSEL

Joshua M. Wesneski (argued), Crystal L. Weeks, and Mark A. Perry, Weil, Gotshal & Manges LLP, Washington, D.C., for Plaintiff-Appellant.

Sara E. Margolis (argued), MoloLamken LLP, New York, New York; Melissa M. Kroeger and Gabriel A. Peraza, Assistant United States Attorneys; Gary M. Restaino, United States Attorney; Office of the United States Attorney, United States Department of Justice, Tucson, Arizona; Jeffrey A. Lamken and Christian I. Bale, MoloLamken LLP, Washington, D.C.; for Defendants-Appellees.

## OPINION

PAEZ, Circuit Judge:

Paul Schwartz alleges that federal prison officials were deliberately indifferent to his serious medical needs in failing to treat adequately a litany of serious symptoms over the course of eighteen months while he was incarcerated at the Federal Correction Institute, Tucson ("FCI-Tucson"). He filed his pro se complaint under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), naming mid-level practitioner Ofelia Tatad and other defendants. After Schwartz's claims against Tatad proceeded through discovery, she moved for judgment on the pleadings, which the district court denied. On Tatad's motion for reconsideration, the district court granted the motion and entered judgment for the defendants, concluding that the Prison Litigation Reform Act ("PLRA") was a special factor that placed Schwartz's claims within a new

*Bivens* context and foreclosed judicial extension of a damages remedy to that context. *See Ziglar v. Abbasi*, 582 U.S. 120, 140 (2017).

We reverse. Schwartz's claim is "identical . . . in all meaningful respects" to *Carlson v. Green*, 446 U.S. 14 (1980), in which the Supreme Court first recognized a *Bivens* claim under the Eighth Amendment for deliberate indifference to serious medical needs. *Watanabe v. Derr*, 115 F.4th 1034, 1036 (9th Cir. 2024). The PLRA, which did not eliminate the *Bivens* causes of action available at the time, but instead governs them, is not a special factor creating a new context at step one of the *Bivens* analytical framework. Tatad also asserts that the availability of the Bureau of Prisons' Administrative Remedy Program and certain factual features of Schwartz's claim are additional meaningful differences, but we hold that neither suffices to engender a new context at step one in this case. Finally, the district court erred in denying Schwartz leave to amend his complaint.

## I.

In April 2014, Paul Schwartz filed a pro se complaint naming eight defendants employed at FCI-Tucson, where he was incarcerated. Describing insufficient medical treatment for a wide array of serious symptoms over a period of approximately eighteen months, Schwartz's complaint alleged the following facts.

Beginning in September 2012, Schwartz experienced inability to concentrate, weakness, severe tremors, tachycardia, irregular heartbeat, profuse sweating, dizziness, chest pain, rapid weight loss, change in urination frequency, blood in urine, severe fatigue, shortness of breath, bulging eyes, headaches, blurred vision, daily diarrhea, and loss of

bowel control. Testing performed in October 2012 confirmed Schwartz's tachycardia and the presence of blood in his urine and indicated "severe" thyroid dysfunction and "possible left atrial enlargement of the heart."

Schwartz received inadequate and untimely medical care, despite his many attempts to contact the defendants through various means and his repeated visits to "sick call." Specifically, Schwartz alleged a three-month delay in receiving diagnostic testing for his thyroid, a five-month delay in receiving medicine to control "daily thyroid storms that were causing dysfunction to multiple organs," and failure to provide the further medical treatments his thyroid condition required. The reason for the blood in his urine was never "completely diagnosed," and his thyroid issue was never "stabilized."

Schwartz alleged that Ms. Tatad, a mid-level care provider at FCI-Tucson, refused to provide him medical treatment or access to a physician and instructed other nurses to deny him treatment. When Schwartz made repeated visits to sick call to seek care for his symptoms, Tatad refused to answer his questions, replying only that he should "watch the call out," though he was never listed on the call out to receive medical attention. Schwartz continued to inquire, prompting Tatad to delete him from sick call. On other occasions, Tatad prescribed only water and exercise to treat Schwartz's severe tremors, chest pain, and shortness of breath, even though another provider had indicated that Schwartz should receive medication for those symptoms.

Schwartz's original complaint also stated claims against seven other defendants. Relevant to the instant appeal, he alleged that Warden Clay and Associate Warden Lamb

ignored multiple emails and other attempts to alert them to the deficient care he was receiving.

Defendants' alleged failure to provide adequate and timely medical care caused Schwartz irreversible kidney injury in the form of "polycystic kidney disease" resulting in "constant pain in the kidneys, constant chest pain," and potential future harms including "long-term damage to heart muscles," "premature heart failure," "early renal failure," and "other kidney and liver related issues."

Shortly after receiving Schwartz's complaint, the district court screened it under 28 U.S.C. § 1915 and dismissed sua sponte five defendants for failure to state a claim for deliberate indifference. At that point, the remaining defendants were Daniel Miller, Acting Health Services Administrator; Thomas Longfellow, Clinical Director; and Tatad. Several months later, the district court granted defendant Miller's motion to dismiss. With respect to Longfellow and Tatad, the case proceeded through discovery.

In September 2017, the district court granted Longfellow and Tatad's motion for summary judgment. In February 2020, we reversed the district court's dismissal only as to Tatad, holding that the evidence viewed in the light most favorable to Schwartz showed that "Tatad repeatedly failed to record [Schwartz's] visits to FCI-Tucson's clinic or refer him for further care, even though he reported—and was documented as having—serious symptoms, such as tachycardia and blood in his urine." *Schwartz v. Tatad*, 787 F. App'x 408, 409 (9th Cir. 2019). We remanded the case for further proceedings and noted that Schwartz could seek leave to amend his claims against the warden and associate

warden of FCI-Tucson, Defendants Clay and Lamb. *Id*. at 408.

Three months after remand, Schwartz filed a motion to amend his complaint, which the district court denied for failure to attach the proposed amended pleading. Schwartz refiled the motion five days later, attaching the proposed amended complaint.[1] The district court denied the motion again, reasoning only that it was "unduly delayed, prejudicial, and futile," and that Schwartz could not satisfy the elements of the relation-back doctrine.

In January 2023, Tatad moved for judgment on the pleadings, arguing that *Egbert v. Boule*, 596 U.S. 482 (2022), foreclosed a *Bivens* action for the claims Schwartz alleged. Rejecting Tatad's motion, the district court found "no meaningful difference between this case and *Carlson [v. Green]*," so Schwartz's claims were cognizable under the Supreme Court's *Bivens* framework. In both *Carlson* and this case, the plaintiffs alleged that the defendants were medical providers whose deficient treatment and failure to provide treatment violated the Eighth Amendment within the context of federally operated prisons. Moreover, the district court concluded that the seriousness of the alleged constitutional violation (e.g., whether Tatad's misconduct or Schwartz's injuries were less severe than those in *Carlson*) was not relevant to the "new context" inquiry, but rather spoke to the merits of the claims. Therefore, Schwartz's

---

[1] Schwartz's proposed amended complaint would have added that the lack of adequate medical treatment caused his Graves' disease to progress to Graves' ophthalmopathy and his kidney issues to progress to stage 3 renal failure. He also would have elaborated on Clay and Lamb's awareness of his condition and deficient treatment and their responses or lack thereof.

claims were not foreclosed by Supreme Court precedent disfavoring the expansion of *Bivens* actions. *See Ziglar*, 582 U.S. at 140.

Tatad moved for reconsideration, which the district court granted in June 2023. Revisiting its analysis of *Ziglar* and *Egbert*, the district court concluded that "despite no meaningful factual differences . . . , this case still extends *Bivens* to a new context because it presents a special factor not considered in previous *Bivens* cases." In the district court's view, the PLRA "will always be a special factor [that *Carlson*] did not consider" "because it did not exist when *Carlson* was decided." At the second step of the *Bivens* analysis, the district court wrote only that "the PLRA is a special factor which indicates 'that the Judiciary is at least arguably less equipped than Congress' to fashion a remedy in this case." *See Egbert*, 596 U.S. at 492.

## II.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo the district court's decision to grant or deny a motion for judgment on the pleadings, accepting the complaint's factual allegations as true and viewing them in the light most favorable to the plaintiff. *LeGras v. AETNA Life Ins. Co.*, 786 F.3d 1233, 1236 (9th Cir. 2015). We review the denial of leave to amend a complaint for abuse of discretion, but review de novo the futility of amendment. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1172 (9th Cir. 2016).

## III.

### A.

In *Bivens*, the Supreme Court held that there was an implied private right of action against a federal agent who

violated the Fourth Amendment in arresting the plaintiff and searching his home. 403 U.S. at 396–97. Within a decade, the Court extended the implied private right of action to two other contexts: a Fifth Amendment employment discrimination claim against a congressman, *see Davis v. Passman*, 442 U.S. 228, 234 (1979), and an Eighth Amendment claim for deliberate indifference to an incarcerated individual's serious medical needs, *see Carlson*, 446 U.S. at 18. Since *Carlson*, the Supreme Court has twelve times declined to extend *Bivens* further. *Harper v. Nedd*, 71 F.4th 1181, 1185 (9th Cir. 2023). "[E]xpanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar*, 582 U.S. at 135 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).

In *Ziglar v. Abbasi*, the Supreme Court clarified the two-step framework that courts must use to decide whether to recognize an implied cause of action against federal agents for constitutional violations. *See* 582 U.S. at 135–37. In the first step, courts ask whether "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Ziglar*, 582 U.S. at 139. Meaningful differences might include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special

> factors that previous *Bivens* cases did not consider.

*Ziglar*, 582 U.S. at 139–40. If the case does not meaningfully differ from one of the three recognized *Bivens* contexts, then the plaintiff has a *Bivens* remedy under that precedent. *Id*. If the case does differ, then courts must consider whether "there are special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* at 136 (internal quotation marks omitted) (quoting *Carlson*, 446 U.S. at 18). This second step focuses on "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id*.

"[E]ven one" step-two special factor is sufficient to foreclose courts from extending a *Bivens* remedy in a new context. *Egbert*, 596 U.S. at 496. Indeed, the second step will resolve against a new *Bivens* remedy "in all but the most unusual circumstances," *id*. at 486, because "in most every case," Congress is better positioned to provide a damages remedy, *id*. at 492. Because a distinguishing feature is likely to implicate some "reason to think that Congress might be better equipped to create a damages remedy" the two steps "often resolve to [that] single question." *Id*. at 492.

"Special factors" are therefore relevant at both steps, but the term's significance differs. At step one, special differentiating factors that previous *Bivens* cases did not consider can engender a new context. At step two, "special factors counselling hesitation" in the absence of congressional action foreclose extension of a *Bivens* remedy to that new context.

**B.**

Schwartz's claim arises from the same context presented in *Carlson*. Schwartz's case cannot be distinguished from *Carlson* by the "meaningful differences" enumerated in *Ziglar* or any other "special factor[] that previous *Bivens* cases did not consider." *See Ziglar*, 582 U.S. at 139–40. The district court erred in finding the PLRA to be one such step-one special factor. While the PLRA did not create any new causes of action against federal prison officials, neither did it foreclose existing *Bivens* claims. Rather, Congress intended the statute to govern such claims. *See Ziglar*, 582 U.S. at 148–49.

Tatad identifies several other features purportedly distinguishing Schwartz's case from *Carlson*, but none suffices. First, she argues that the Bureau of Prisons' Administrative Remedy Program ("ARP"), 28 C.F.R. § 542, is a special factor at step one, but the ARP is only relevant at step two. Second, she argues that certain factual features of Schwartz's claim engender a new context: the chronic nature of his medical condition and the lesser severity of his medical mistreatment. Tatad avers that these factual questions also implicate *Ziglar*'s fourth and sixth differentiating factors—the "extent of judicial guidance as to how an officer should respond" and the "risk of disruptive intrusion by the Judiciary into the functioning of other branches." But she provides little support for either proposition. Ultimately, severity of the harm or misconduct is not a "meaningful difference" distinguishing the context of Schwartz's claims from *Carlson*. We address Tatad's arguments in turn.

### 1. The PLRA

Sixteen years after *Carlson*, Congress passed the Prison Litigation Reform Act, which imposed procedural restrictions on prisoner lawsuits. *See* 42 U.S.C. § 1997e; 18 U.S.C. § 3626; 28 U.S.C. § 1915(g). The PLRA requires administrative exhaustion, 42 U.S.C. § 1997e(a), bars suits for purely mental and emotional injuries, 42 U.S.C. § 1997e(e), requires indigent prisoners to pay filing fees in full, 28 U.S.C. § 1915, excludes prisoners from *in forma pauperis* status if they have previously filed three suits that were dismissed for being frivolous, malicious, or for failure to state a claim, 28 U.S.C. § 1915(g), and requires that any injunctive relief concerning prison conditions be "narrowly drawn," 18 U.S.C. § 3626(a)(1)(A). Because the PLRA addressed prisoner litigation without creating a damages remedy against federal officials, Tatad argues that it constitutes a "special factor that previous *Bivens* cases did not consider" under *Ziglar*. The district court granted Tatad's motion for judgment on the pleadings on similar grounds, reasoning that the *Carlson* court could not have considered the PLRA because Congress adopted it after that case was decided.

As *Ziglar* made clear, the PLRA may be relevant in determining whether to extend *Bivens* to a new context at step two, but it is not a special factor at step one. This is because Congress intended the PLRA to govern *Bivens* actions in existence at the time of its enactment, not to abolish them. *Ziglar*, 582 U.S. at 149 (noting that the Court "has said in dicta that the [PLRA's] exhaustion provisions would apply to *Bivens* suits" (citing *Porter v. Nussle,* 534

U.S. 516, 524 (2002))).[2] In fact, *Ziglar* noted that the absence of a "standalone damages remedy against federal jailers" in the PLRA represented Congress's decision "not to extend the *Carlson* damages remedy to cases involving *other types* of prisoner mistreatment." *Id*. at 149 (emphasis added). Thus, the Court clearly implied that the PLRA acknowledged and did not disturb the availability of a damages remedy to address the *same* type of prisoner mistreatment at issue in *Carlson*.

Our cases follow *Ziglar* in treating the PLRA as a special factor only at step two. In *Marquez v. C. Rodriguez*, we held that the PLRA counselled hesitation in extending *Carlson* to a new Eighth Amendment context involving prison officials' failure to protect the plaintiff from abuse by other prisoners. 81 F.4th 1027, 1033 (9th Cir. 2023). Likewise, in *Chambers v. C. Herrera*, the PLRA counselled hesitation in extending *Carlson* to an Eighth Amendment claim for failure to protect the plaintiff from assaults by a prison official, although we noted that the plaintiff may have been able to state a viable claim for deliberate medical indifference that followed the assaults. 78 F.4th 1100, 1106–07, 1108 (9th Cir. 2023). Because the PLRA did not foreclose *Carlson* claims but was instead intended to govern them, it is only relevant at step two of the *Bivens* analysis.

---

[2] Tatad's contrary argument relies on the proposition that the PLRA would have provided a damages remedy for Eighth Amendment medical difference if Congress had deemed it appropriate. But first, the PLRA is a procedural statute which neither created nor destroyed substantive rights. *See* 42 U.S.C. § 1997e; 18 U.S.C. § 3626; 28 U.S.C. § 1915(g). And second, providing prisoners with such a remedy through the PLRA would have been unnecessary given that *Carlson* actions were already available.

## 2. Administrative Remedy Program

The Bureau of Prisons' ("BOP") Administrative Remedy Program, 28 C.F.R. § 542, is likewise not a "special factor[] that previous *Bivens* cases did not consider," capable of distinguishing a new *Bivens* context at step one. *Ziglar*, 582 U.S. at 140. Step-one special factors are "meaningful" differences that render a context "new." *Id*. at 139. The ARP is not a special factor at step one because it was in place when *Carlson* was decided. *See* Administrative Remedy Program, 44 Fed. Reg. 62,250 (Oct. 29, 1979) (to be codified at 28 C.F.R. § 542); *Carlson,* 446 U.S. at 14. Moreover, alternative remedies are not typically relevant at step one where they do not distinguish the context of the violation, but merely speak to the appropriateness of a judicial remedy.

The ARP is a four-step procedure for resolving prisoner grievances. At the first step, the prisoner must raise his grievance informally with a member of the institution's staff. 28 C.F.R. § 542.13(a). If the informal process does not resolve his grievance, he may escalate it formally, using standardized forms which must be submitted and reviewed within specified time periods. *Id*. §§ 542.14–542.18.[3] Under the PLRA, use of the ARP is a mandatory prerequisite to filing suit in federal court. 42 U.S.C. § 1997e(a).

---

[3] Specifically, the second step of the ARP requires the prisoner to submit a form BP-9 to a designated staff member, within 20 days of the incident giving rise to the grievance. 28 C.F.R. § 542.14(a),(c). If the prisoner is unsatisfied with the warden's response or receives no response within 20 days, then he has another 20 days to appeal to the appropriate BOP Regional Director using form BP-10. *Id*. §§ 542.15, 542.18. If the prisoner is unsatisfied with the Regional Director's response or receives no response within 30 days, he may seek a final review from the BOP's General Counsel by submitting a form BP-11 within 30 days. *Id*. §§ 542.15, 542.18.

In *Watanabe v. Derr*, we held that the ARP did not create a new context at step one in a *Carlson* action. 115 F.4th at 1043. In that case, the plaintiff alleged that BOP officials were deliberately indifferent to his serious medical needs in failing to treat adequately his bone-related injuries from a prison fight. *Id*. at 1036–37. The district court found that "the BOP's administrative remedy program was not considered by the Court in *Carlson*, and thus concluded that its existence offered another reason that Watanabe's claim arises in a new context." *Id*. at 1042 (internal quotations omitted). We reversed, holding that "the existence of alternative remedial structures does not render this case a new context." *Id*.

*Watanabe*'s holding is supported by the structure of the two-step *Bivens* analysis laid out by *Ziglar*. First, *Ziglar* instructs courts to evaluate whether a "case is different in a meaningful way from previous *Bivens* cases" to determine whether the context is "new." 582 U.S. at 139. The final rule creating the ARP was published and became effective in October and November of 1979, while *Carlson* was decided in 1980. *See* Administrative Remedy Program, 44 Fed. Reg. 62,250 (Oct. 29, 1979) (to be codified at 28 C.F.R. § 542). Although the program has been amended since, those changes did not alter its nature or basic mechanisms. *See, e.g.*, Administrative Remedy Program, 61 Fed. Reg. 88 (Jan. 2, 1996) (to be codified at 28 C.F.R. § 542). Because the ARP was in place when *Carlson* was decided, it is not a "meaningful difference" and does not create a "new" context at step one.

Second, *Ziglar*'s two-step analysis gives alternative remedies a greater role at step two. Step one focuses on the alleged violation, examining the right violated, the mechanism of injury, the identity of the federal official and

the guidance available to that official, and the factual and legal context within which the alleged violation is interpreted. *See Ziglar*, 582 U.S. at 139–40. Step two, by contrast, focuses on remedies. In asking whether the judiciary ought to provide a remedy, it considers whether Congress or the Executive has already done so. *See Egbert*, 596 U.S. at 492–93. When the alleged violation can be established and analyzed without reference to the alternative remedial structure at issue, that structure has little import at step one.

*Harper v. Nedd* illustrates this principle. 71 F.4th 1181 (9th Cir. 2023). In that case, we held that the alternative remedies afforded by the Civil Service Reform Act ("CSRA") [4] made for a new *Bivens* context where the plaintiff alleged that officials violated his right to due process as they performed their duties in affording him those remedies. *See id.* at 1187; *see also id.* at 1188 (noting that Harper "alleged that Defendants took '*ultra vires* actions' that 'corrupted' the CSRA process and violated his Fifth Amendment rights"); *id.* at 1187 n.1 (noting that Harper alleged "that Defendants conspired to deprive him of an appeal to the [Merit Systems Protection Board]"). The CSRA was therefore an alternative remedy uniquely relevant at step one because it constituted a distinct "statutory or other legal mandate under which the officer was operating." *Id.* at

---

[4] The CSRA is a comprehensive legal scheme governing federal employment. *See* Civil Service Reform Act of 1978 (CSRA), Pub. L. 95-454, 92 Stat. 1111 (1978) (codified in various sections of 5 U.S.C.); *id.* § 4303 (requiring detailed notice of and opportunities to challenge adverse employment actions based on unacceptable performance); *id.* § 7501 (allowing an employee to be suspended without pay for 14 days, as Harper was); *id.* §§ 7512, 7513(d), 7703(b)(1) (appeal procedures).

1187. The alternative remedy was an inextricable component of the alleged due process violation.

By contrast, Schwartz complained of conduct entirely separate from the administration of the ARP. Unlike in *Harper*, the ARP played no role in the Eighth Amendment violation Schwartz alleged. It is not then appropriately considered at the first step of the *Bivens* analysis, which focuses on the context of the alleged violation.

Consistent with *Ziglar*'s analytical structure, the Supreme Court and this court have otherwise considered alternative remedies only when deciding whether to extend *Bivens* to a new context. *See Watanabe*, 115 F.4th at 1042 (noting that *Egbert* "clarified that the existence of alternative remedial structures can be one 'special factor,' to be considered at the *second* step of the *Bivens* analysis"). In *Ziglar*, the Court laid out a comprehensive *Bivens* framework without suggesting that alternative remedies, such as the ARP, generally have a role at step one. *See* 582 U.S. at 136–37, 139–40. *Ziglar* consistently treated alternative remedies as step-two special factors. For instance, the Court stated that "the existence of alternative remedies usually precludes a court from *authorizing* a *Bivens* action," referring to the step-two decision concerning whether to extend *Bivens* into a new context. *Id*. at 148 (emphasis added).

In keeping with *Ziglar*, our cases are also uniform in treating the ARP as a special factor only at step two. *See, e.g.*, *Stanard v. Dy*, 88 F.4th 811, 818 (9th Cir. 2023); *Chambers*, 78 F.4th at 1106; *Pettibone v. Russell*, 59 F.4th 449, 456 (9th Cir. 2023); *Mejia v. Miller*, 61 F.4th 663, 669 (9th Cir. 2023); *Vega v. United States*, 881 F.3d 1146, 1154

(9th Cir. 2018); *Lanuza v. Love*, 899 F.3d 1019, 1032 (9th Cir. 2018).

In sum, while alternative remedies may play a role at step one in specific cases, the ARP does not distinguish a new context here.

### 3. Severity of Injury and Misconduct

Tatad argues that factual differences concerning the nature and severity of Schwartz's medical needs create a new context distinguishable from *Carlson*. She argues that these differences constitute "special factors that previous *Bivens* cases did not consider" and also implicate "the risk of disruptive intrusion by the Judiciary into the functioning of other branches" and the "extent of judicial guidance as to how an officer should respond."

Our precedents foreclose Tatad's argument. For instance, in *Watanabe*, the plaintiff was denied medical treatment for over a year for severe pain resulting from a fractured coccyx. 115 F.4th at 1042. Rejecting the defendant's arguments that Watanabe's claims were distinguishable from *Carlson* because his condition was not life threatening, we held that "a plaintiff need not allege a harm as severe as the one in *Carlson* . . . because the underlying harm was still a failure to provide medical attention evidencing deliberate indifference to serious medical needs." *Id*. at 1041–42 (cleaned up). We further made clear that "even if [the plaintiff's medical need] is not technically life-threatening," his *Carlson* claim could proceed. *Id*. at 1042.

Similarly, in *Stanard v. Dy*, the plaintiff unsuccessfully sought treatment for Hepatitis C ("HCV") for months before eventually receiving medication that rendered his HCV

undetectable. 88 F.4th at 814. We held that "even assuming that Stanard received less deficient care than the inmate in *Carlson*, that difference in degree is not a meaningful difference giving rise to a new context." *Id*. at 817. Rather, "'[a]long every dimension the Supreme Court has identified as relevant to the inquiry,' Stanard's case is a 'replay' of *Carlson*." *Id.* (quoting *Hicks v. Ferreyra*, 965 F.3d 302, 311 (4th Cir. 2020)).

Finally, in *Chambers v. C. Herrera*, we held that an incarcerated person who alleged deliberate medical indifference resulting in a broken wrist and arm may be able to bring a viable *Carlson* claim. *See* 78 F.4th at 1108 (holding that the plaintiff's complaint alleged insufficient factual detail to make out a medical indifference claim under *Carlson*, but that it was possible that "more detailed factual allegations could cure the deficiencies").

In sum, in recent years we have thrice ruled that deliberate indifference to chronic and non-life-threatening conditions can support a *Carlson* action. In those cases, we explicitly rejected arguments that the severity—of the medical condition or the officers' conduct—constituted a meaningful difference under *Ziglar*'s framework for analyzing *Bivens* claims. Schwartz's medical condition, which he alleges *is* life-threatening, cannot be the basis on which to distinguish *Carlson*.

Asserting that Schwartz's claimed injuries "pale in comparison to [the *Carlson* plaintiff's]," Tatad argues that the chronic and less severe nature of Schwartz's condition "profoundly affects" the "costs and benefits" of affording a *Bivens* action because chronic medical conditions are "presumably more 'common' than life-threatening health emergencies." For that reason, she argues that the allegedly

lesser severity also implicates "the risk of disruptive intrusion by the Judiciary into the functioning of other branches."

As a preliminary matter, Tatad offers no factual support for the proposition that chronic conditions arise more frequently such that allowing a *Bivens* remedy is "likely to impose a significant expansion of government liability." And as Schwartz points out, "[c]ourts have been adjudicating *Carlson* claims for years without any indication that such suits have interfered with the orderly administration of the prison system."

Finally, Tatad's argument that there is less judicial guidance concerning non-emergent or chronic medical issues is utterly unsupported.[5] In *Carlson*, the "judicial guidance" available to the officers was the principle set out in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), which established that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *See Carlson*, 446 U.S. at 17 & n.3. In the intervening years since *Carlson*, courts have only further developed that caselaw. *See, e.g.*, *Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006); *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014); *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018).

"To conclude that a claim extends *Carlson* because it is weaker than the claim in *Carlson* is to undermine *Carlson* itself—the very thing the Supreme Court has asked us not to do." *Waltermeyer v. Hazlewood*, 136 F.4th 361, 371 (1st Cir. 2025) (Breyer, J., dissenting).

---

[5] For one thing, the asthma that afflicted the *Carlson* plaintiff *was* a chronic condition, although it became emergent.

**4. Opportunity for Prospective Relief**

Lastly, Tatad argues that the chronic, rather than emergent, nature of Schwartz's medical issues allowed him to access prospective remedies that the *Carlson* decedent could not, including the ARP and injunctive relief. In her view, the different relationship between the harm and remedy places Schwartz's claims within a new context.

As noted above, this circuit has repeatedly upheld a *Carlson* cause of action for individuals with chronic, non-emergent illnesses. The plaintiffs in *Watanabe*, who suffered from a bone injury, and *Stanard*, who suffered from Hepatitis C, had ample time to seek alternative remedies and did so. Tatad's argument is accordingly foreclosed by this court's precedents. *Watanabe*, 115 F.4th at 1042; *Stanard*, 88 F.4th at 814, 818. Moreover, this argument appears to simply reframe Tatad's earlier argument that newly available remedies like the ARP can make for a new context at step one. As discussed above, alternative remedies are typically relevant at step two.

*\*\*\**

Schwartz's claim involves the same officer rank, institutional setting, judicial guidance, and governing legal mandate as *Carlson*. His claim challenges the exact same type of conduct: acts and omissions constituting improper medical care resulting from alleged deliberate indifference to serious—indeed, life-threatening—medical needs. Because Schwartz's claims arise in the same context as *Carlson*, they are cognizable under *Bivens*. No step two analysis is required.

## IV.

In our prior decision in this case, we stated that on remand Schwartz could seek leave to amend his complaint with respect to Defendants Clay and Lamb. *Schwartz*, 787 F. App'x at 409. In denying Schwartz leave to amend, the district court abused its discretion by failing to sufficiently support its decision under the analytical framework provided by Federal Rule of Civil Procedure 15(a)(2) and *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Under Rule 15(a)(2), courts should freely give leave to amend when justice so requires. Amendment should be permitted unless the opposing party makes a showing of "undue delay, bad faith . . . , undue prejudice . . . , [or] futility of amendment." *Foman*, 371 U.S. at 182. Courts should also consider the number of times the plaintiff has already been allowed to amend. *Id*. These factors are evaluated as a whole, but the consideration of prejudice to the opposing party carries the greatest weight and delay cannot be individually decisive. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 185–86 (9th Cir. 1987); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). The standard governing leave to amend is especially permissive where, as here, the plaintiff is pro se. *See Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

If a district court denies a motion for leave to amend, the record must "clearly indicate[] reasons for the district court's denial," or the court must "provide written findings" of "prejudice to the opposing party, bad faith by the moving party, or futility of amendment." *DCD Programs*, 833 F.2d at 186–87. Where there are no adequate "written findings" and no clear basis for denial in the record, denial of leave to amend will be reversed. *Id.* at 186; *Hurn v. Ret. Fund Tr. of*

*Plumbing, Heating & Piping Indus. of S. Cal.*, 648 F.2d 1252, 1254 (9th Cir. 1981). Here, while the district court's order cited undue delay, prejudice, and futility, it did not provide any explanation to support those findings.

Nor does the record provide a clear basis for denial. In Schwartz's prior appeal, we held that Schwartz could seek leave to amend his complaint against Clay and Lamb, because "[t]here is at least some evidence in the record . . . that Clay and Lamb knew of the violations alleged by Schwartz and failed to act to prevent them." *Schwartz*, 787 F. App'x at 409 (cleaned up). Schwartz appears to have worked diligently to amend his complaint after we put him on notice that he could do so. *See id*. at 408. Moreover, the claims which Schwartz seeks to add would not "greatly alter[] the nature of the litigation" or "require[] defendants to [] undertake[], at a late hour, an entirely new course of defense." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). Tatad's strategy is unlikely to be affected if Clay and Lamb rejoin her as codefendants. And any relevant evidence is likely to be readily available given that the litigation in this matter has been ongoing for more than a decade.

Contrary to the district court's ruling, Schwartz's proposed amended claims would not be barred by the statute of limitations because the relation-back doctrine applies. Under Rule 15(c), an amendment to a pleading can "relate[] back to the date of the original pleading" when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Where those circumstances apply, relation back is allowed as long as the defendants were on notice, Fed. R. Civ. P. 15(c)(3), which may be imputed to someone who

shares an attorney or an "identity of interest" with an existing defendant in the case. Both conditions are likely satisfied here because DOJ jointly represented the defendants[6] and because Clay and Lamb share a close institutional relationship with Tatad as her superiors at FCI-Tucson. *See Singletary v. Pa. Dept. of Corr.*, 266 F.3d 186, 195–96 (3d Cir. 2001).

## Conclusion

In concluding that the PLRA "has the effect of destroying the *Bivens* remedy for Eighth Amendment claims brought by federal prisoners," the district court contradicted decades of Supreme Court precedent confirming the validity of *Carlson* after the enactment of the PLRA. *See Ziglar*, 582 U.S. at 131, 147–48; *Minneci*, 565 U.S. at 126; *Malesko*, 534 U.S. at 740; *Egbert*, 596 U.S. at 490–91. Our decisions have also repeatedly and expressly affirmed *Carlson*, most recently in *Watanabe*, 115 F.4th 1034. Schwartz's claim arises in the same context as *Carlson*, notwithstanding the PLRA, ARP or factual features of his case, and may therefore proceed under *Bivens*.

**REVERSED**.

---

[6] The district court dismissed Clay and Lamb after its sua sponte review pursuant to 28 U.S.C. § 1915(a), before service was executed on the U.S. Attorney's Office. However, as Schwartz argues, it is unlikely that the U.S. Attorney's Office did not make Clay and Lamb aware of the litigation, as they were named in the initial suit, described in the complaint as having actual knowledge of the relevant events, and were in a leadership position as the warden and associate warden of the prison within which the events transpired.